STATE v. EMILINE SHUFORD.

On the trial of the mother for the murder of her infant child, it is error in the Court below to permit a witness to relate a statement made by the mother of the prisoner and in her presence, that the prisoner "had a child this way before, and put it away," to which the prisoner made no reply, and the reception of such evidence entitles the prisoner to a new trial.

Evidence of a distinct, substantive offence cannot be admitted in support of another offence.

(*Homesley* v. *Hogue*, 2 Jones, 391, cited and approved.)

INDICTMENT for murder, tried at Spring Term, 1873, of CATAWBA Superior Court, before his Honor, *Mitchell, J.*

The prisoner, a colored woman, with one Geo. Haynes, (the latter not arrested,) was indicted for killing a new born infant, her child.

On Tuesday of the term, the prisoner was arraigned and pleaded "not guilty," and a special *venire* of seventy-five jurors ordered to be summoned to appear on the coming Thursday. On Wednesday, the Solicitor for the State sent a new bill to the grand jury against the same parties for the same offence, which being found " a true bill," the prisoner on that day was again arraigned and pleaded "not guilty" to the second indictment, and on which the trial proceeded, and a special *venire* of seventy-five jurors again ordered. No *nol pros.* or any other order was made in the first case.

On Thursday morning, when the case was called, the prisoner's counsel asked leave to withdraw the plea of " not guilty," to enable the prisoner to plead in abatement, the pendency of the first indictment and the arraignment thereon. The motion was refused, and the prisoner excepted.

Prisoner's counsel then moved to be allowed to enter the plea in abatement in addition to the plea of " not guilty." Motion refused, and exception by the prisoner.

On the trial and during the calling of the original panel,

one England, a juror belonging thereto, was directed by the Solicitor to stand aside, without being challenged for cause. No jury was obtained from the original panel, and the State without recalling and tendering England, proceeded to call the special *venire*, summoned on Tuesday. No other *venire* had been summoned by the sheriff under the order of Wednesday.

Prisoner's counsel then challenged the array of the special *venire*, and called attention to the order and the date of its execution, and also to the order made on Wednesday. This challenged was not allowed, and the prisoner excepted.

A juror from the special *venire* was called, and tendered by the State. After juror was sworn, prisoner's counsel asked him "if he had formed the opinion that the prisoner at the bar was guilty," without first asking if he had formed and expressed an opinion. The State objected. Objection sustained, and the defendant excepted. Another juror was called and tendered. Prisoner's counsel proposed to swear and examine him as to his "unindifferency," before challinging him for cause, and that after the juror had answered, he might then have the right to challenge. State objected, and the Court sustained the objection. Prisoner excepted.

Prisoner's counsel proposed to ask another juror whether he had paid his taxes for this year or the previous year. Question ruled out, and prisoner again excepted. The jury impanelled, the State called Betsy Seltzer, a colored midwife, who testified that she knew the prisoner; who in September last, lived in a negro village near Newton, at which time her person was very large, and as she, the witness, believed pregnant. That she was called to see prisoner, Wednesday, 4th of September, 1872; that she found her in a feeble, prostrate condition, lying on a pallet on the floor of the room in which the prisoner and her mother lived; that she examined her person and found that she had been

delivered of a child, which witness thinks was born on Tuesday night.

There was no child there, and prisoner denied having been delivered of a child. Witness called again on Thursday evening, and found the prisoner quite feeble. Prisoner asked witness "if any white folks had come to her about the matter." She was told "no," but that witness expected them, and if anything was there, they would find it. Prisoner still denied the birth of the child. After dark, witness with prisoner's mother went to a church near by, leaving prisoner in the house alone, but before going, made arrangements with Adam Hoyle, Scott Hunter and Peter Byors, colored men, to watch the prisoner's movements and see if they could find the child. On her cross-examination, the witness stated that she saw no child on Wednesday or Thursday, though she understood numbers of persons searched for it. Witness further stated that the prisoner's box or chest contained a quantity of baby clothing, as generally prepared by pregnant women.

Witness further testified that about the time preaching closed, she learned that the child had been found near the house, and she went down there; there was a crowd assembled and much talk and commotion; she could not remember much that was said; witness saw the child lying on its face near the house on the ground; it was a black child, fully developed, and had one leg cut off just above the ankle; witness did not handle it; it smelled offensively; witness knew George Haynes, the prisoner indicted; he was a black man, married and lived about Newton for over a year, and for sometime previous to September, in a house near where the prisoner lived; witness had not seen him for some time; that he suddenly disappeared after the child was found, and she had not seen him since.

Dr. Campbell examined the child on Friday for the coroner's jury. It was a fully developed black child, with

its forehead and face mashed in as from a blow by a blunt instrument; skull was broken, much contusion, but skin not cut; one of its legs was off just above the ankle, it seemed to have been cut one-third round with a knife, then the bone broken and the part torn off; that the lungs were inflated fully, swam in water and gave every indication that the child was born alive. Witness further described the appearance of the child, giving it as his opinion that it was killed.

Adam Hoyle, watched prisoner's house on Thursday night. Soon after witness and others had taken their position, they saw prisoner coming up to the house from a westerly course, about 30 or 40 feet from the door; she was in a stooping posture, and entered the door on the west side; witness, with Scott Hunter, went up to the chimney, which was low and unfinished, and peeped into the house and saw prisoner take off a black skirt and place it on the bed; they made a noise and prisoner blew out the light; witness and those that were with him, about this time, smelt something very offensive, which proved to be the child, and sent for Betsy Seltzer; she, with others, came and searched the house but found nothing; prisoner left the house at this time, when witness heard some one calling for a light, and when he got there he saw the child on the ground with its face to the earth; prisoner saw it and exclaimed, "Lord-y, what is that!" She afterwards acknowledged that it was her child, but said it was born dead; there was a number of negro men and women there, and much talking and confusion; after the crowd had partly dispersed, witness and others nailed up one of the doors of prisoner's house, so she could not get out, and then they sat down at the front door and in the house, and there remained all night to watch the prisoner; that during the night, when asked about it, prisoner said the child was hers, but was born dead. Counsel for the prisoner objected to the introduction of prisoner's declara-

tions under the circumstances. Objection overruled, and prisoner excepted. Witness also testified that he knew George Haynes, and that he suddenly left soon after the child was found.

Lorenzo Bost, testified to the finding, &c., corroborating the other witness as to the facts above set out in his evidence; witness further stated, after objection by prisoner, that the prisoner's mother, in the presence of the prisoner and others, said that night that "she (the prisoner) had a child this way before, and put it away," and the prisoner made no reply. The Court admitted the evidence, and prisoner excepted. This declaration of the mother was deposed to by other witnesses, and objected to by prisoner.

Other witnesses for the State were examined, but testified to no other material facts.

His Honor was asked by the prisoner's counsel to charge the jury:

1. If the child was killed while the prisoner was not present, the jury must acquit.

2. If there is any reasonable way to account for the death of the child, except that charged in the bill of indictment, the prisoner was entitled to the doubt.

3. If the child came to its death from the combined effects of the wound on the leg and the wound on the head, the jury must acquit.

4. That the evidence being circumstantial, it must produce an effect and conviction as clear and strong as one credible and respectable witness, to sustain a verdict of guilty.

5. That the means and manner whereby the death of the child took place being known, charged and proven by the State, that the jury could not convict on the last count.

The Court instructed the jury, in answer to the foregoing propositions:

1. To acquit the prisoner if she were not present when the child was killed.

2. That if there was any reasonable way, consistent with the evidence in the case to account for the death of the child, the prisoner was entitled to the benefit of the doubt in her favor.

3. The 3d prayer for instruction, the Court declined to give.

4. The Court charged as requested.

The jury found a verdict of guilty. Prisoner moved for a new trial, on the ground of the exceptions taken and noted, as to the introduction of evidence ; and also, because the State proceeded with the special *venire* before recalling and tendering England, one of the original panel, whom the Solicitor had stood aside; and because his Honor did not state the evidence of Dr. Campbell to the jury, and because his Honor's charge was calculated to mislead the jury.

Prisoner also moved in arrest of judgment, because the child was not described with sufficient certainty in the indictment.

Motion in arrest of judgment refused. Motion for a new trial also refused. Judgment of death, and appeal by the prisoner.

*Schenck,* for appellant, submitted :

1. The Court erred in admitting the declarations of prisoner's mother in prisoner's presence. "That prisoner had a child before, and put it away." This was irrelevant. Ros. Cr. Ev. page 56. Whar. Crim. Law, vol. 1, sec. 647. *Homesley* v. *Hogue,* 2 Jones 392.

2. Court violated the statute, Rev. Code, ch. 31 sec. 136, by clearly intimating an opinion to the jury. *Nash* v. *Morton,* 3 Jones, page 3; *State* v. *Simmons,* 6 Jones 23; *State* v.

*Ingold,* 4 Jones 220; *State* v. *Cardwell,* Busb. 248. This error is irrevocable, *State* v. *Dick,* 2 Win. 45.

The evidence was not "fully stated" in the charge. *State Morris,* 3 Hawks 388; *Bailey* v. *Pool,* 13 Ired. 405; *State* v. *Jones,* 67 N. C. Rep. 285.

The whole scope of the charge was prejudicial and unjust to the prisoner. *Boykin* v. *Perry,* 4 Jones 326; *Powell* v. *R. R.,* 68 N. C. Rep. 397.

The Court stated the evidence incorrectly. The prisoner never admitted that the child was born alive.

The indictment is defective as it only charges the killing of an "infant child," without giving name or sex, or accounting for the omission.

All the precedents are against this form of the indictment. *Rex* v. *Sheen,* 12 E. C. L. Rep. 295; *Rex* v. *Smith,* 25 E. C. L. Rep. 327; *Biss case,* 34 E. C. L. Rep. 630; *Willis case,* 47 E. C. L. Rep. 720; Arch. Crim. Pl. 234 (Marg.) Whar. Am. Cr. Law of Homicide 258. Bish. Crim. Pro., vol. 2, 513. *Regina* v. *Waters,* Head's Leading Cr. cases, vol. 2, page 152; *State* v. *Penland,* 1 Phil. N. C. Rep. 224.

*Attorney General Hargrove,* for the State.

SETTLE, J. The prisoner being on trial for the murder of her child, recently born, the Court permitted three witnesses to state to the jury, that the mother of the prisoner said in her presence, just after the dead body was found, and while the prisoner was under arrest, that "she had a child this way before, and put it away," and that the prisoner made no reply, and it was argued from her silence that she had confessed the charge of putting away the first child. Of course the purpose of this evidence was to induce the jury to conclude that if the prisoner had put away one child, she would murder another. It might be suggested

that concealing the birth of a child born dead, is a very different offence from the killing of one born alive.

But evidence of matters not alleged is only admissible when it tends to prove or disprove the fact in issue. The fact in issue here was the guilt or innocence of the prisoner on the charge of killing the child, and evidence tending to prove that she was guilty of the murder of the first child was wholly irrelevant, but well calculated to prejudice and mislead a jury.

"Evidence of a distinct substantive offence cannot be admitted in support of another offense. So, proof of a distinct murder, committed by the defendant at a different time, or of some other felony or transaction committed upon or against a different person, and at a different time, in which the defendant participated, cannot be admitted until proof has been given, establishing, or tending to establish, the offence with which he is charged, and showing some connection between the different transactions ; or such facts and circumstances as will warrant a presumption that the latter grew out of, and was to some extent induced by some circumstances connected with the former." Wharton Am. Crim. Law 647.

Admitting, for the sake of argument, that the prisoner did put away her child, there is no connection between that crime and the murder of her second child. The acts did not form one transaction, nor did the latter in any manner grow out of the first.

It is true that in *Com.* v. *Wilson,* 2 Cushing 590, it was held that where a prisoner was indicted as an accessory before the fact, to the crime of killing a person who had been actively engaged in ascertaining the perpetrators of a former murder, evidence of the guilt of the accused as to the former murder was held admissible, for the purpose of showing motive as to the second murder.

But there, it will be observed, that it became necessary to

show guilty knowledge and malicious intent growing out of the first transaction ; and it is admitted that such cases form exceptions to the rule already stated. In *Homesley* v. *Hogue,* 2 Jones 391, the Court in holding that it was not competent for a creditor, in order to establish the fraud in question, to show that the debtor had made a fraudulent transfer of of other property to another person, say, "Whether the plaintiff had defrauded his vendee in the sale of the land, had no more bearing upon the issue before the jury, than to prove that in the sale of the horse to another person he had committed a fraud, or to prove he was in the habit of committing fraud. That A has made an usurious contract with B, is no proof that his contract with C is usurious. Such evidence is irrelevant and mischievous, having a direct tendency to mislead the jury."

As the prisoner is clearly entitled to a *venire de novo* for the admission of this evidence, we will not further notice the many exceptions taken by the defendant's counsel, who argued the case with zeal and ability in this Court.

Perhaps, however, it is proper to notice the fact that his Honor in charging the jury, after calling their attention to the witnesses, who testified to the pregnancy of the prisoner, the finding of the body of the child in her possession, and its remaining in an unchanged condition until the coroner and physician arrived, added the words "the prisoner in the mean time detained, on the admission that the child was born alive."

What his Honor construed into an admission that the child was born alive, must have been the prisoner's silence, when her mother said in her presence, that she had a child in this way before, and put it away, for the prisoner repeatedly declared that the child was born dead, and she at no time admitted otherwise, unless her silence, when charged with another crime, be construed into such an admission.

At all events it is readily perceived how such a remark from his Honor could have unjustly prejudiced the case of the prisoner.

PER CURIAM.                                    *Venire de novo.*