The defendant was indicted on the following bill of indictment:
"North Carolina — New Hanover County.
"Superior Court, January Term, 1937.
"The jurors for the State upon their oath do present, that E. L. Smoak, late of New Hanover County, on the 1st day of December, A.D. 1936, with force and arms, at and in the said county, feloniously, willfully, and of his malice aforethought, did kill and murder Annie Thelma Smoak, contrary to the form of the statute, in such case made and provided, and against the peace and dignity of the State.
(Signed) BURNEY, Solicitor."
A true bill was found by the grand jury, and the defendant was put on trial. "On motion of counsel for the defendant, the jury was polled, and each juror, for himself, doth say that the defendant is guilty of murder in the first degree." Upon the verdict, the court below imposed upon the defendant the sentence of death. *Page 82 
The State relied on evidence to the effect that the defendant killed his daughter, Annie Thelma Smoak, about 16 years of age, by administering strychnine. She died on 1 December, 1936. Shortly prior to this, on Thanksgiving Day, 26 November, 1936, she was taken to a hospital and the physicians treated her there for strychnine poisoning.
Jack Penny testified that he was employed by the Brooklyn Pharmacy on 19 November, 1936, and about 5 o'clock in the afternoon the defendant purchased from him a small bottle of strychnine — an eighth of an ounce. The defendant stated that he wanted the strychnine for hogs. Jack Penny recorded the sale, name, address, and purpose. At that time defendant had no hogs. Later he said it was to kill cats and dogs or whatever was eating his chickens and biddies. The evidence tended to show that at different periods defendant bought strychnine.
(1) Defendant had taken out insurance on the life of his daughter, Annie Thelma Smoak: (a) $445.00 on 1 April, 1935, in the Metropolitan Life Insurance Company, payable to her closest relative; (b) $445.00 on 16 March, 1936, in the American National Insurance Company, with defendant as beneficiary. A premium was paid on 25 November, 1936, through the week of 14 December — two weeks further in advance than he paid any other policy which he held with that company; (c) $100.00 in the Andrews Mutual Burial Association, which was taken out on 28 October, 1936.
W. G. Stewart testified: "Her head was drawn backward, the hands seemed to be clinched in a very tight position, and it was necessary to break up the rigor mortis to straighten them — the feet were extended, the toes being forward." It was also in evidence that Annie Thelma Smoak and Alice Mason Smoak both died with violent convulsions.
(2) Policy in the Metropolitan Life Insurance Company on the life of Alice Mason Smoak, his second wife, for $565.00. The policy was dated 25 December, 1932. Also policy in the Life Insurance Company of Virginia for $250.00. Defendant filed proof of death and was paid — her death occurred 8 July, 1935. She married defendant 7 October, 1932.
(3) Policy carried in Life Insurance Company of Virginia and Metropolitan Life Insurance Company on the life of Georgia Jones Smoak, his first wife, for about $500.00. This was paid defendant. She died in 1922 in a manner similar to that of Annie Thelma Smoak.
(4) He took out a policy of insurance in the American National Life Insurance Company on the life of Mrs. Bertha Stewart, mother of Mrs. Jeannette Harker, about 11 November, 1935, in which he was named as beneficiary, and represented in the policy that his relationship to her was that of cousin. Her physician said that she came near dying from strychnine poisoning, which defendant had given her and which he said *Page 83 
was "indigestion powders." It was also in evidence that defendant had taken out insurance on the life of Mrs. Jeannette Harker and his two sons.
The first wife of defendant was Georgia Jones Smoak, mother of Annie Thelma Smoak. After her death (9 months thereafter) he married Alice Mason Smoak, who died on 8 July, 1935. Before and after her death, he paid attention to Mrs. Jeannette Harker, a widow about 26 years of age, and took her, about a week after his wife's death, into his home to live. Before his wife died he bought her a house-dress and she wrote him while in a hospital and stayed at his house off and on after she first went there. He gave her $5.00 every two weeks and paid her insurance — 90c a week. In consequence, Annie Thelma Smoak left and went to the home of Evylin Horne. Evylin Horne testified, in part: "Mr. Smoak came to the house about four o'clock, or a little after, one afternoon in October, 1936. . . . He said, `Thelma, why did you leave home?' and she said, `I could not get along with Mrs. Harker, and I thought it would be best to leave home.' . . . Thelma said, `Daddy, I can't have any friends, and nobody can come to see me,' and he said, `Why?' She said, `Mrs. Horne won't let her children come there because Mrs. Harker is there,' and he said, `She is a perfect lady.' I said, `All I know is what Thelma has told me.' Thelma said, `Please don't let daddy take me,' and she kept holding my hand, and said, `I am scared to go home, I don't know what he will do to me.' . . . Mr. Smoak said, `Are you coming home?' and she said `No,' and he kept asking her why, and she kept telling him she could not get along with Mrs. Harker. He said, `I have a housekeeper there,' and she said, `I know, but you make me do all the work.' . . . All the time Thelma was crying." Thereafter the matter was taken up with the welfare officers of New Hanover County and she went to her father's home.
Wash Morgan testified, in part: "I know E. L. Smoak. He came to my place some time in the fall of 1936. Q. State what conversation you had with him, please, in reference to Thelma Smoak, his daughter? (Exception.) A. He came there about half-past three o'clock on a Wednesday evening. He came to my store about the middle of October, and asked if I knew where his daughter, Thelma, was, and I said I did not. I said she stayed down here Monday night. I asked him what was the trouble between him and Thelma. He said she was running around and doing a whole lot of lying. I asked him about what, and he said concerning him and Mrs. Harker, and if she didn't quit it, he was going to beat her half to death. I asked him about Mrs. Harker and he said Mrs. Harker had not stayed a night in his home, and had not been in his home in over a month, and he said if she did not stop lying on him he was going to kill her. (Exception.) At the solicitation of *Page 84 
the sheriff, I went up in the jail and made that statement in the presence of Mr. Smoak, and he told me I was lying." Mrs. Wash Morgan and Annie Morgan testified to the same effect as to defendant's threat to kill his daughter.
On Thanksgiving evening, 26 November, 1936, Annie Thelma Smoak was taken sick while in an automobile with defendant and Mrs. Jeannette Harker. She was taken to a hospital and defendant said he had given her one "B. C." powder. She recovered from the attack. Before her death Annie Thelma Smoak was perfectly normal and slightly nervous. Defendant had brought home some capsules which he said was quinine prescribed by Dr. W. J. Lancaster. Dr. Lancaster testified that he had not prescribed anything for defendant's daughter, nor had he been consulted about her condition. It was in evidence that immediately after the death of Annie Thelma Smoak the defendant took steps to collect the insurance on her life.
Dr. Heywood M. Taylor testified, in part: "I am assistant professor of biological chemistry and toxicology at Duke medical School. (Court) Let him explain what a toxicologist is. Ans: A toxicologist is one who detects the presence of poisons. I got my B. S. in chemistry at the University of North Carolina; my Master of Chemistry and my S. and Ph. D. at the same institution. I further had special training in toxicology with Dr. Gadler in the Chief Medical Examiner's office in New York City. I was there for three months. I was also an instructor at the University of North Carolina in general chemistry, analytical chemistry, and organic chemistry. I have been connected with the Duke University since 1 July, 1930." Dr. Taylor was found by the court below to be an expert in toxicology and chemistry, and was asked the following question: "Q. Assuming the jury should find from the evidence, and beyond a reasonable doubt, that Annie Thelma Smoak died on 1 December, 1936; with violent convulsions; her head drawn back, and her hands clinched; that she was practically rigid; that the undertaker had to straighten her fingers out; that she was taken to Orangeburg, S.C., buried, and on 10 December, the body was exhumed; that the liver, kidneys, and brains were taken therefrom, carried to you, and from the chemical analysis you made, and the strychnine you found there, have you an opinion satisfactory to yourself as to the cause of her death? Ans.: Yes, sir. Q. What is it? (Exception.) Ans.: My opinion is she died from strychnine poisoning. . . . A therapeutic dose of strychnine is two milligrams. In ordinary every-day language, that would be a regular medicinal dose. I found approximately seventeen times that amount in the viscera of Annie Thelma Smoak. Two milligrams, roughly speaking, is the thirtieth of a grain, and I said I found 34.04 milligrams. That is about half a grain, or a little over half a *Page 85 
grain. I recovered that from the liver and the brain alone. You will find strychnine in the kidneys and sometimes it is found in the urine, and it has been reported found in the bones. Q. Is it possible to recover the maximum amount of strychnine from the body? Ans.: The maximum amount that could be recovered would depend on how much was present. It is a hard matter to say how much we can get out. We cannot get more than is there. Q. State what the percentage of recovery is? (Court) You qualified as an expert; if you have an opinion satisfactory to yourself, from your experience, and from your training, as to the maximum amount that could be obtained, or discovered, you could say so. Ans.: I think that would vary from ten to twenty-five per cent. (Mr. Grant) Of What? Ans.: Of the total amount present." (Exception.)
Dr. Charles B. Graham, a practicing physician, held to be an expert, treated her at the hospital. He testified, in part: "I saw Annie Thelma Smoak at the hospital the morning after her admission. (Admitted Thanksgiving Day, 26 November, 1936.) I discussed her case, and the history of it, with Dr. Warshauer. I am familiar with the medicine given her the night she was admitted. Q. Was that the proper treatment to counteract strychnine poisoning? Ans.: Yes, sir. I did not assist in the puncture of her spine. I saw the patient the following morning, after she had been admitted to the hospital. She was perfectly conscious at the time I saw her, and she seemed to be a little depressed, and drowsy from the excitement and the sedative she had during the night, and complained of headache and muscular soreness. Her general condition seemed to be good. She left the hospital Saturday afternoon, at 6:15, I think. She was admitted on Thanksgiving Day, Thursday, and left the following Saturday. Q. Assuming the jury should find from the evidence, and beyond a reasonable doubt, that on Thanksgiving night, 26 November, 1936, Annie Thelma Smoak was in violent convulsions; was carried to the hospital, and given the treatment that you spoke of, and that she was carried home Saturday night, and on Tuesday morning, 1 December, she was taken with violent convulsions, and died before the doctor arrived; that her body was rigid; her hands clinched so much so that the undertaker had to straighten the fingers out; that she was buried in Orangeburg, S.C., on 3 December; her body exhumed on 10 December; the kidneys, liver, and brains taken to Dr. Heywood Taylor, toxicologist at Duke University; that a chemical analysis was made, and 34.04 milligrams of strychnine found in her body, have you an opinion satisfactory to yourself as to the cause of her death? Ans.: I do. Q. What is it? (Exception.) Ans.: Strychnine poisoning."
Dr. S.E. Warshauer, found by the court below to be a medical expert, upon like hypothetical question being propounded to him, testified: "In my opinion she died of strychnine poisoning." (Exception.) *Page 86 
Dr. J. E. Evans, a practicing physician, found by the court below to be an expert, testified, in part: "On Thanksgiving night . . . Mr. Smoak appeared at my door and asked me to come out and see his girl, who was sick in the car. . . . We carried her into my house. . . . She was in a state of violent convulsions. I asked what medicine she had taken, and he replied that she had one `B. C.' powder. I began to try to investigate to find out, as best I could, what was the trouble with her. She was conscious. There in the presence of the defendant, in the midst of her convulsions she would scream and ask me to do something for her; that she was going to die. I am familiar with strychnine. The symptoms of strychnine poisoning are marked convulsions, periodic convulsions, and contraction of the hands and arms. Q. State if the symptoms she had at that time were those of strychnine poisoning? (Exception.) Ans.: It was strongly suggestive."
Leon P. Andrews, owner of the Andrews Mortuary, testified that on 8 July, 1935, he saw Alice Mason Smoak, who had just passed away. "Her body was very tense, and her hands clinched, and her feet turned downward, and the toes inclined inward. The body was warm. I took the body to the mortuary, and it was buried at Oakdale Cemetery in a single grave plot. I have seen the body since, but I do not recall the date. It was this year. I prepared the body for burial, and buried the body. I exhumed the body, and removed it to my undertaking parlors, where an autopsy was performed on it by Dr. Graham Barefoot and Dr. A. H. Elliott. That was three or four weeks ago. When the body was exhumed the condition of the fingers was the same as when the body was buried; so was the condition of the feet; drawn."
Dr. Victor Sullivan, found by the court below to be a medical expert, testified, in part: "Q. Assuming that the jury should find that Alice Mason Smoak, on 8 July, 1935, was seized with violent convulsions; that her head was drawn back; her body rigid; that she cried out `hold me,' and when the undertaker arrived her body was still warm, and rigid; her hands were clenched; that she was prepared for burial and buried on 10 July, 1935; that about 7 February, 1937, the body was exhumed; an autopsy performed and the kidneys, liver, lungs, and brains taken therefrom, and delivered to Dr. Heywood Taylor, toxicologist at Duke University; that he reports the finding of strychnine in the body in sufficient amount to cause death, have you an opinion satisfactory to yourself as to the cause of the death of Alice Mason Smoak? Ans.: Yes, sir. Q. State what that opinion is. (Exception.) Ans.: That she died from strychnine poisoning."
Dr. A. H. Elliott, a physician held by the court to be a medical expert, testified, in part: "Dr. Barefoot and I performed an autopsy on the body of Alice Mason Smoak about three weeks ago, at Andrews *Page 87 
Mortuary, at Third and Red Cross. Q. What organs were taken from the body. Ans.: We took what there was of the brain, and the liver; both kidneys, the stomach and part of the lung. Q. State whether or not Alice Mason Smoak was pregnant. (Exception.) Ans.: She was. We tried to estimate how long she had been pregnant from the length of the fetus, which is the way of calculating the period of gestation, but whether or not there was any considerable shrinkage or not I don't know, but according to the length of the fetus we recovered, we estimated it was between three and four months. With the exception of the fetus, we took all of the organs we removed from the body to Dr. Taylor, at Durham. I, myself, delivered them to Dr. Taylor."
Dr. Heywood M. Taylor, recalled, testified, in part: "About three weeks ago Dr. A. H. Elliott brought me certain specimens purporting to be from the body of Alice Mason Smoak. They were brought to me on 5 February, 1937. He brought me the liver, the brain, and portions of the lungs, the stomach and the kidneys. Q. Did you make a chemical analysis of a part of the parts, or specimens he brought you? Ans.: I did. I analyzed the liver and kidneys. The condition of the kidney and liver was very good; the body had been embalmed; the brain appeared to be very much decayed. The kidney and liver were combined; ground up, and extracted with acid alcohol; the extract was cleared up; taken up in water solution; made alkaline, and extracted with ether; the ether was evaporated off, and the extract dissolved in water, and tested for alkaloids, and the residue is dissolved in acid; and is treated with potassium dichromate and sulphuric acid. The material was then subjected to another test with ammonium vanadate, and it was tested with bromide. All of the tests showed the characteristics of strychnine poison. A portion of the material was put in solution and injected into a live frog, and violent strychnine convulsions were obtained. On the basis of the total weight, I recovered 22 milligrams of strychnine from the liver and the kidney. That is sufficient amount to cause death. Q. Assuming that the jury should find that on 8 July, 1935, Alice Mason Smoak suffered with severe convulsions; that her head was drawn; her hands clinched, and shortly thereafter she died; was buried on 10 July; that her body was embalmed; that it was exhumed, and those parts of the organs taken to you and from the amount of strychnine found by you, have you an opinion satisfactory to yourself as to the cause of her death? (Exception.) Ans.: I have. Q. What is that opinion? Ans.: Strychnine poisoning."
Dr. J. E. Evans, a practicing physician, found by the court below to be an expert, recalled, testified, in part: "Q. Assuming that the jury should find from the evidence and beyond a reasonable doubt that on the afternoon of 8 July, 1935, Alice Mason Smoak was seized with violent convulsions; *Page 88 
that her head was drawn back; her hands clinched; and she cried out, `Hold me,' and died in a short time, and when the undertaker arrived her hands were clinched, and her body rigid, and still warm; that she was buried on 10 July, and about 7 February, this year, the body was exhumed, and an autopsy performed; the kidneys, lungs and liver taken to Dr. Heywood Taylor, toxicologist at Duke University, and from a chemical analysis there he found 22 milligrams of strychnine, have you an opinion satisfactory to yourself as to the cause of the death of Alice Mason Smoak? Ans.: I have. Q. What is that opinion? (Exception.) Strychnine poisoning." Prior to her death she was in a normal condition.
Dr. H. A. Codington, Alice Mason Smoak's physician, held by the court below to be an expert, testified, in part: "This improvement continued straight along until 5 June, when she was so much better I let her go home with instructions to advise me if she did not continue to improve, or to feel well. She returned to my office on 13 June, complaining of a little flow of blood. For this she was given an injection we have that frequently checks these flows, and she returned on the 15th for another injection, which she received, and that stopped the flow, and she seemed to progress satisfactorily, and I didn't see her any more until 8 July, 1935, at which time I was called to come at once to her home, that she was desperately ill. I got to the home about thirty minutes after the call, and she had just died. . . . Q. If the jury should find from the evidence and beyond a reasonable doubt that Alice Mason Smoak, on 8 July, 1935, was seized in the afternoon, or early night, with violent convulsions; that her head was drawn; her arms stretched and hands clinched and she cried out for someone to hold her, and in a short time she died, and when the undertaker arrived the body was warm but it was stiff; that he removed her to his undertaking establishment; that the body was embalmed; that she was buried in Oakdale Cemetery on 10 July; that on 7 February, 1937, the body was exhumed, an autopsy performed; the liver, kidneys, and brain taken therefrom and delivered to Dr. Heywood Taylor, toxicologist at Duke University, who upon a chemical analysis found strychnine of sufficient amount to cause death, have you an opinion satisfactory to yourself as to the cause of the death of Alice Mason Smoak? Ans.: I do. Q. What is that opinion. (Exception.) Ans.: My opinion is that death was caused by some convulsive drug, or a drug capable of producing convulsions, probably of the strychnine family."
The defendant, in 1919, married Georgia Jones. Of this marriage was born Annie Thelma Smoak. Georgia Jones Smoak died on 10 February, 1922. In regard to her death, Mrs. S.D. Collins testified, in part: "I was sitting at the foot of the bed, and Mr. Smoak was sitting *Page 89 
on the bed to his wife's left, and we were discussing her illness in the hospital. She said she thought she had been poisoned, because she acted like she had been poisoned, and Mr. Smoak said he thought she had been poisoned, too. Q. What did she ask you to do, if anything? (Court) Was that in the presence of the defendant? Ans.: Yes, sir, in the defendant's presence." (Exception.)
There was plenary evidence in the record on which to base the hypothetical questions asked the experts. The defendant denied his guilt. He stated that the cause of Annie Thelma Smoak's death was overexertion on Thanksgiving Day, fits, convulsions, epilepsy.
Roy Vann, a witness for defendant, testified on direct examination: "I have known the defendant for twelve to thirteen years. I am leading machinist now in the Atlantic Coast Line shops in Wilmington. I have been connected with the Atlantic Coast Line for twenty-five to twenty-eight years. I was at one time foreman of the roundhouse, and held that position for fifteen years. Q. How many men do you work in the Wilmington terminal of the Coast line. (State objects; sustained; exception.) (If allowed to answer, the witness would have said: `In the roundhouse, about sixty men; there were more during the time I was foreman.') I did not know the general esteem in which Mr. Smoak was held prior to his indictment for the murder of his daughter. Q. Did you know the esteem he was held, and his general character among the employees of the Atlantic Coast Line? (State objects; sustained; exception.) (If allowed to testify, the witness would have said: `It is good.')"
Several witnesses were asked similar questions. The State objected, which was sustained, and defendant excepted. Many witnesses testified that defendant's general reputation was good.
There was much evidence on the part of the State corroborating the above evidence set forth. The defendant assigned error to the exceptions above set forth and made numerous other exceptions and assignments of error, and appealed to the Supreme Court. The material ones and necessary facts will be set forth in the opinion.
The defendant, at the close of the State's evidence and at the close of all the evidence, moved in the court below to dismiss the action or for judgment of nonsuit. C. S., 4643. The court below denied the motions, and in this we can see no error.
From the statement of facts above set forth on the part of the State, there was plenary evidence to be submitted to the jury as to the guilt of defendant. *Page 90 
"On motion to dismiss or judgment of nonsuit, the evidence is to be taken in the light most favorable to the State, and it is entitled to the benefit of every reasonable intendment upon the evidence and every reasonable inference to be drawn therefrom. `An exception to a motion to dismiss in a criminal action taken after the close of the State's evidence, and renewed by defendant after the introduction of his own evidence does not confine the appeal to the State's evidence alone, and a conviction will be sustained under the second exception if there is any evidence on the whole record of the defendant's guilt.' S. v. Earp, ante, at p. 166. See S.v. Carlson, 171 N.C. 818; S. v. Sigmon, 190 N.C. 684. The evidence favorable alone to the State is considered — defendant's evidence is discarded. S. v. Utley, 126 N.C. 997. The competency, admissibility, and sufficiency of evidence is for the court to determine, the weight, effect, and credibility is for the jury. S. v. Utley, supra; S. v. Blackwelder,182 N.C. 899. The evidence in the case was circumstantial." S. v. Lawrence,196 N.C. 562, at p. 564.
The charge of the court below is not in the record and the presumption of law is that the court charged the jury as to the law applicable to the facts, the law of circumstantial evidence, and every other material aspect of the law that arose from the facts in this case.
The defendant contends that he was tried for other offenses of which he was not charged in the bill of indictment. Under well settled law in this jurisdiction, this contention is untenable. The other like offenses were to show the scienter, intent, and motive of defendant. On this record they are so connected or associated that this evidence would throw light upon the question of his guilt.
In Wharton's Criminal Evidence, Vol. 1 (11th Ed.), section 352, pp. 527-8, we find: "Evidence of other crimes may be admitted when it tends to establish a common scheme or plan embracing the commission of a series of crimes so related to each other that proof of one tends to prove the other, and to show the defendant's guilt of the crime charged. . . . The question is one of induction, and the larger the number of consistent facts the more complete the induction. . . . (p. 532). Like crimes committed against the same class of persons, at about the same time, tend to show the same general design, and evidence of the same is relevant and may lead to proof of identity."
In Underhill's Criminal Evidence (4th Ed.), section 187, pp. 344-5, it is written: "Another exception to the general rule is that evidence of other crimes of the same general character is admissible when it tends to prove, plan, system, habit, or scheme of related offenses, or a design to commit a series of like crimes. This exception has been applied to many and varied kinds of offenses, such as murder, etc. Commonwealth v. Chalfa,313 Pa. 175, 169 A. 164." *Page 91 
In S. v. Miller, 189 N.C. 695 (696), speaking to the subject, it is said: "It is undoubtedly the general rule of law, with some exceptions, that evidence of a distinct substantive offense is inadmissible to prove another and independent crime, the two being wholly disconnected and in no way related to each other. S. v. McCall, 131 N.C. 798; S. v. Graham,121 N.C. 623; S. v. Frazier, 118 N.C. 1257; S. v. Jeffries, 117 N.C. 727;S. v. Shuford, 69 N.C. 486. But to this there is the exception, as well established as the rule itself, that proof of the commission of other like offenses is competent to show the quo animo, intent, design, guilty knowledge, or scienter, when such crimes are so connected with the offense charged as to throw light upon this question. S. v. Simons, 178 N.C. 679, and cases there cited. Proof of other like offenses is also competent to show the identity of the person charged with the crime. S. v. Weaver,104 N.C. 758. The exceptions to the rule are so fully discussed by Walker,J., in S. v. Stancill, 178 N.C. 683, and in a valuable note to the case of People v. Molineaux, 168 N.Y. 264, reported in 62 L.R.A., 193-357, that we deem it unnecessary to repeat what had there been so well said on the subject." This decision was cited with approval and applied in the recent case of S. v. Flowers, 211 N.C. 721.
North Carolina follows the general rule and its exceptions. An interesting discussion of the subject can be found in Vol. 16, N.C. Law Review, No. 1, December, 1937, p. 24, where the North Carolina cases are fully cited as to where collateral offenses have been held admissible to show intent.
The admissibility of evidence of previous poisonings to show motive andscienter is most clearly brought out by the case of People v. Gosden, 56 P.2d Ed.), 211 (Calif., 1936). The defendant had taken out insurance on a first and second wife. Both had died from strychnine poisoning. He was tried for the death of his second wife, and at the trial objected to introduction of evidence showing the similarity of the circumstances surrounding the death of his first wife. In upholding the admissibility of the evidence, the California Court said: "This evidence tended to show that each died of strychnine poisoning, each was insured with the appellant as the beneficiary, and in each case the appellant attempted immediately upon the death of the wife to collect the insurance upon her life. The evidence as to the death of the first wife and the fact that her life was insured with the appellant as beneficiary was properly admitted to show motive of the appellant in the murder of his second wife. People v. Northcott,209 Calif., 639, 652, 289 P. 634, 70 A.L.R., 806. It was also admissible to show knowledge on the part of the appellant as to the effect of administering strychnine to a human being." See, also Goersen v.Commonwealth, 99 Pa. St. Reports, 388 (1882), and Zoldoske v. State,52 N.W. 778 (Wis., 1892). *Page 92 
To the effect that such evidence is admissible to show criminal intent are: People v. MacGregor, 114 N.W. 869 (Mich., 1914); People v. Seaman, 65 N.E. 203 (Mich.); People v. Tokly, 144 N.E. 808 (Ill.); Goersen v.Commonwealth, supra; People v. Gosden, supra; Zoldoske v. State, supra; andState v. Hyde, 136 S.W. 316 (Mo.).
The defendant cites People v. Molineaux, 168 N.Y. Rep., p. 264. That case is distinguishable from the present case. On the facts in that case, the Court held: "Therefore, the events connected with the alleged former crime are not so related to the crime charged as to form an exception to the general rule excluding such proof, and thus bring it within one of the above mentioned exceptions, and the reception of such evidence constitutes reversible error." There are, of course, a few cases in which evidence of similar poisonings was excluded. In these cases the exclusion did not result from failure of the courts to recognize exceptions to the general rule. They are based on the grounds that the facts involved did not fall within the exception. In his brief defendant relies on People v. Molineaux,supra, but there the defendant was on trial for a murder which was induced by hatred arising out of certain quarrels. The State attempted to introduce evidence that the defendant had killed another person by use of the same peculiar poison, but the motive for this second killing was jealousy caused by intervention in a love affair. The ruling excluding this evidence was upheld on the narrow ground of the difference in motive. In People v.MacGregor, supra, the Michigan Court considered the Molineaux case, supra
(p. 882), and carefully distinguished it upon this ground.
The Molineaux case, supra, was tried in 1901. It may be of interest to the profession to know that two North Carolinians appeared in that famous case: James Walker Osborne (a kinsman of the late Justice Platt D. Walker, former member of this Court), who was Assistant District Attorney of New York and prosecuted and brought about the conviction of Molineaux, and George Gordon Battle, who represented him and obtained a reversal of the conviction — a new trial being ordered by the Court of Appeals of New York.
Was Dr. Heywood M. Taylor such an expert that he was competent to answer the hypothetical question propounded by the State? We think so. We may say that from a careful review of the State's evidence, it was plenary and sufficient to base the hypothetical questions propounded to the different experts on, whose testimony is above set forth.
Black's Law Dictionary (3rd Ed.), p. 912, defines "hypothetical question": "A combination of assumed or proved facts and circumstances, stated in such form as to constitute a coherent and specific situation or state of facts, upon which the opinion of an expert is asked, by way of evidence on a trial," citing authorities. *Page 93 
Dr. Taylor was assistant professor of biological chemistry and toxicology at Duke Medical School, and stated that he held the degree of Doctor of Philosophy in these subjects and had had special training in toxicology in the Chief Medical Examiner's office in New York City. Although not an M. D., he had taught chemistry at the University of North Carolina and had been connected with Duke since 1930. He had studied chemistry for more than twenty years. The court found that he was an expert in toxicology and chemistry. In this there was no error. The competency of a witness as an expert is primarily addressed to the discretion of the trial judge, whose decision is ordinarily not reviewable. Flynt v.Bodenhamer, 80 N.C. 205; Hardy v. Dahl, 210 N.C. 530. It is not necessary that an expert witness be a licensed physician. Hardy v. Dahl,supra, at p. 535.
Dr. Taylor described in detail the symptoms of strychnine poisoning generally, his examination of the vital organs of Annie Thelma Smoak, and his discovery in her body many times as much strychnine as constitutes a regular medicinal dose. He stated that experts could recover from the body from ten to twenty-five per cent of the strychnine present, and that he found in the body of Annie Thelma Smoak sufficient strychnine to cause death. In reply to a hypothetical question including the symptoms and conditions of Annie Thelma Smoak's death, the time of death, of exhumation of the body, and of the delivery to him of the vital organs examined, he gave as his opinion that "she died from strychnine poisoning." The question, in the usual form, was based upon the assumption that the jury would find as facts that these events, conditions, and times were as contended for by the State, and there was ample evidence supporting each of these contentions. The hypothetical question was a proper one. Martin v.Knitting Co., 189 N.C. 644; McManus v. R. R., 174 N.C. 735; Pigford v.R. R., 160 N.C. 93; Ray v. Ray, 98 N.C. 566; S. v. Bowman, 78 N.C. 509. It was not essential that the hypothetical question include all the evidence bearing upon the alleged facts. Godfrey v. Power Co., 190 N.C. 24.
The evidence in regard to the defendant's first wife, Georgia Jones Smoak, was remote, but, linked in with the other evidence, we think it was a circumstance to be considered by the jury. At least it was not prejudicial, as defendant denied any effort on his part to poison her.
Was the evidence of those with whom he worked competent on which to base a question as to the general reputation of defendant? We think it not. "`The rule as to this matter has been fully settled by many decisions of this Court. It is this: The party himself, when he goes upon the witness stand, can be asked questions as to particular acts, impeaching his character, but as to other witnesses it is only competent to ask the witness if he "knows the general character of the party." If he *Page 94 
answers "No," he must be stood aside. If he answers "Yes," then the witness can of his own accord qualify his testimony as to what extent the character of the party attacked is good or bad.' Clark, C. J., in Edwards v. Price,162 N.C. 244. See, also, S. v. Gee, 92 N.C. 760; S. v. Ussery,118 N.C. 1177; S. v. Holly, 155 N.C. 485; S. v. Robertson,166 N.C. 356; S. v. Killian, 173 N.C. 796; Tillotson v. Currin,176 N.C. 484; S. v. Haywood, 182 N.C. 815." S. v. Steen,185 N.C. 768 (778).
Defendant sought to show by several witnesses his "general character among the employees of the Atlantic Coast Line." There was no error in refusing to allow such questions on direct examination. "In North Carolina the testimony of a character witness is confined by the general reputation of a person whose character is attacked, or supported, in the community inwhich he lives. S. v. Parks, 25 N.C. 296; S. v. Perkins, 66 N.C. 126;S. v. Gee, 92 N.C. 756; S. v. Wheeler, 104 N.C. 893; S. v. Coley,114 N.C. 879, and numerous other cases since. Reputation is the general opinion, good or bad, held of a person by those of a community in which heresides. This is eminently a matter of hearsay, based upon what the witness had heard or learned, not as to any particular acts, but as to the generalopinion or standing in the community." (Italics ours.) S. v. Steen,185 N.C. 768, 770. The emphasis upon the word "community" is significant. It is not the reputation of a man among a particular group — such as his associates in church, lodge, or business — which is competent in evidence, it is his reputation generally in the community which is admissible. As stated by Chief Justice Tilghman in Wike v. Lightner, 11 Ser. Rawle, at p. 199: "The question is, What is said by people in general? This is the true point of inquiry, and everything which stops short of it is incorrect."
The testimony of Dr. Taylor as to taking so many milligrams of strychnine from the brain, liver, and estimating the balance is not prejudicial, as the amount he found was sufficient to produce death. Most of the defendant's exceptions and assignments of error became immaterial when defendant went on the stand and similar evidence during the course of the trial was introduced without objection. The evidence of Mrs. Harker was competent to show motive, and also that of Mrs. Mason — at least circumstances to be considered by the jury. Dr. J. E. Evans' testimony was a link in the chain of circumstances and competent for what it was worth. He said of the symptoms, "It was strongly suggestive." Yates v. Chair Co.,211 N.C. 200. He had treated Annie Thelma Smoak and had personal knowledge of her symptoms, and was a physician qualified to know. So was the testimony of Dr. Victor Sullivan, Dr. S.E. Warshauser, and Dr. Chas. B. Graham competent. Shaw v. Handle Co., 188 N.C. 222 (232). *Page 95 
The evidence in regard to Alice Mason Smoak's condition was competent — a link in the chain.
The evidence of C. David Jones, sheriff of New Hanover County, was competent: "I told Mr. Smoak I wanted to ask him a few questions and he said `All right.'" S. v. Caldwell, 212 N.C. 484; S. v. Perry, 212 N.C. 533. The testimony of Leon P. Andrews in regard to what was the condition of Alice Mason Smoak after her death was a link in the chain, and competent. The fact that a witness for an insurance company stated that the insurance on the life of Annie Thelma Smoak was paid two weeks further in advance than any other policy which defendant held with his company was a link in the chain and competent. The evidence relative to insurance on the life of Mrs. Bertha Stewart, mother of Jeannette Harker, and on Jeannette Harker, was also a link in the chain. The testimony of the physicians found to be experts was competent.
We have read the record and able briefs of defendant with care, and none of his exceptions and assignments of error can be sustained.
The evidence in this case tends to show that the defendant attempted to poison his young daughter, Annie Thelma Smoak, with strychnine on Thanksgiving Day, 26 November, 1936, and that on 1 December, 1936, he again gave her strychnine, from the effects of which she died. He had purchased strychnine poison prior to that time, on 19 November, 1936. He had ill will against his daughter, who resented the fact that in a week or two after the death of his wife, Alice Mason Smoak, he had taken a widow, Jeannette Harker, into his home. Further, he had insurance on the life of Annie Thelma Smoak, which he attempted to collect immediately after her death. He also had insurance on the life of Alice Mason Smoak, his second wife (who died of strychnine poisoning), which he collected. He had insurance on the life of Mrs. Bertha Stewart, mother of Jeannette Harker, payable to him, and she came near dying from strychnine poisoning after taking medicine which he gave her for "indigestion." He had insurance on the life of his first wife, Georgia Jones Smoak, who in the presence of defendant said she had been poisoned. The crime of which defendant was convicted is horrible and unthinkable; but, on the record there is sufficient evidence of his guilt, and the jury so found.
We find on the record no prejudicial or reversible error.
No error. *Page 96