STATE v. ALFRED PUCKETT.

(Filed 6 January, 1937.)

1. **Criminal Law § 56—Motion in arrest of judgment will not be allowed for defects in indictment which do not vitiate.**

Defendant was tried for murder under an indictment charging disjunctively murder with malice, premeditation, and deliberation and murder in the perpetration of a robbery. C. S., 4614. After the return of a verdict of guilty of murder in the first degree, defendant moved in arrest of judgment for that the indictment was alternative, indefinite, and uncertain. *Held:* Although the indictment was alternative, either charge constituted murder in the first degree, C. S., 4200, informing defendant of the crime charged, and defendant's remedy, if he desired greater certainty, was by motion for a bill of particulars, C. S., 4613, or to require the solicitor to elect at the close of the evidence, but the charge in the alternative was not a vitiating defect, and the motion in arrest after verdict was properly denied, such motion being available only for vitiating defects upon the record proper. C. S., 4625.

2. **Homicide § 14—Indictment charging disjunctively premeditated murder and murder in perpetration of robbery held not void for uncertainty.**

An indictment charging defendant disjunctively with murder committed with malice, premeditation, and deliberation and with murder committed in the perpetration of a robbery, is not void for uncertainty, since either charge constitutes murder in the first degree, and defendant's remedy, if

he desires more specific information in order to prepare his defense, is by motion for a bill of particulars, C. S., 4613, but a motion in arrest of judgment after a verdict of guilty of murder in the first degree, is properly denied.

**3. Homicide § 20—Evidence that defendant had same amount of money after crime that was on person of deceased held competent.**

Evidence that prior to the commission of the homicide deceased had a certain amount of money on his person, largely in twenty-dollar bills, which was gone after the commission of the crime, and that prior to the crime defendant was without money, but that soon thereafter he had about the same amount of money that was missing from the person of the deceased, and that the money in defendant's possession was largely in twenty-dollar bills, *is held* competent, in connection with the evidence identifying defendant as the perpetrator of the crime, to show that the motive of the crime was robbery as charged in one count of the bill of indictment, the weight and credibility of the evidence being for the jury.

**4. Homicide §§ 2, 27a—Charge on aspect of guilt of each person taking part in robbery in which victim was killed held sufficient.**

The State's evidence tending to show that defendant, in company with two others, went to a filling station with the purpose of robbing the owner, that in execution of their purpose, all being present and participating in the crime, the owner was killed. The court charged the jury that defendant would be guilty of first degree murder even if one of the others fired the fatal shot, if it was fired in the execution of their unlawful conspiracy and agreement. Defendant excepted on the ground that the court did not define "conspiracy." *Held:* The exception cannot be sustained, in the absence of a special request for instructions, the term "conspiracy" being used synonymously with "agreement," and the charge being clear and easily understood, and defendant being guilty of murder in the first degree under the evidence regardless of the existence of a technical conspiracy.

**5. Criminal Law § 53d—**

In the absence of a special request for instructions, the failure of the charge to define certain terms constituting a subordinate feature of the charge will not be held for error.

APPEAL by defendant from *Rousseau, J.,* and a jury, at July Term, 1936, of RICHMOND. No error.

The defendant was indicted with Foyle M. Cox and Paul Mackey for the murder, on 2 May, 1936, of Roy Rhyne. The defendant was convicted of murder in the first degree and duly sentenced to be gassed in accordance with law. Cox submitted to murder in the second degree. Paul Mackey has not been taken.

The bill of indictment is as follows:

"STATE OF NORTH CAROLINA—SUPERIOR COURT.

RICHMOND COUNTY—JULY TERM, 1936.

"The jurors for the State, upon their oath, present: That Alfred Puckett, Foyle M. Cox, and Paul Meckling, *alias* Paul Mackey, late of

the county of Richmond, on the 2nd day of May, 1936, with force and arms at and in the county aforesaid, willfully, unlawfully, and feloniously, with premeditation and deliberation, and of their malice aforethought, or while engaged in the perpetration or attempted perpetration of robbery, did kill and murder one Roy Rhyne, against the form of the statute in such case made and provided, and against the peace and dignity of the State. PRUETTE, *Solicitor.*"

The deceased, Roy Rhyne, ran a service station and had a tourist camp two and a half miles west of the town of Rockingham, on State Highway No. 74, formerly No. 20.

Lee Morse testified for the State, in part: "I worked for Roy Rhyne 2 May, 1936, and had been off and on for four and a half years. . . . Roy and I were at the filling station the afternoon of 2 May. I was about 15 steps from it lying on a single bed or cot, and Roy was sitting on it—the side towards Rockingham. About 4:45 or 4:30 Roy said there was a car at the front, and I told him to wait on it, I was tired. He said 'O.K.' and I saw him go in the back door of the station. Red Puckett (Alfred Puckett, defendant) comes from the opposite side and walks in back of Roy about three feet, and when I walks in Roy called me—called me before I went in. Neither had a gun in sight then. When this other fellow I identified as Swain—of course, I could be mistaken, covered me, Roy there grabbed at the barrel of the gun, when Puckett told him to give him his cash. Roy was two feet from the side door of the station (pointing out). Puckett was about two and a half feet from Roy when he threw the gun, in about two and a half feet of Roy when I walked in, and I got in three feet of Puckett when he grabbed his gun. Roy backed to the side door and went in his room. When I got inside the door Puckett began shooting and shot twice. He had Roy by the shoulder and put the gun in his stomach the last time I saw him. Three shots were fired; I saw the first one; it did not hit Roy. I examined the building later to see where the bullets went in, and found signs, one in the bedroom facing of the north window, and one right below it about eight inches. I heard Roy fall and in two or three seconds Puckett comes out of that side room. I looked back at him but was scared to move away from this other man, Swain, and he said, 'I have killed that one in there,' and he ran his hand in my pocket and said, 'I had better search you,' and turns and walks out the back door and told this other fellow Swain to 'make him throw up his hands and walk to the back door and not look back,' and naturally I did it. When Puckett went out the back door and told me to march out after he got out I went and marched out, and I heard the front door screen slam, heard the motor start up, and I went to the side of the filling

station to see what kind of car they were in. I did not see but two men in the car and saw them in a '36 Buick. Looked like they were taking off with as much speed as a car could do. . . . I went in and looked at Roy and seen he was dead, and I drove to Five Points and called the sheriff. . . . There was a pistol at the station that day, under the pillow in my bedroom, in the front room on the left as you go in the station; saw it 30 or 40 minutes before it took place. After Puckett left I looked and it was not there. Roy got that pistol from Mr. Finch; saw him deliver it. . . . The other man was across the show case and had a .45 in my face. They took between $41 and $46 off of me, part in paper, part in silver. Do not know whether Mr. Rhyne had any money on his person that day; saw him with a pretty good roll on him Friday morning; looked like a lot of twenties. Don't know how much he had. Saw a lot of twenties Friday when I checked the money with him and gave him some money." The witness, Lee Morse, was asked: "How much money did you see him count out there in your presence?" The defendant objected; the objection was over-ruled, and he was permitted to answer: "It looked like $800 or $900; that was Friday, the day before. After he was shot, Mr. King, the coroner, searched him, in my presence, and found $1.00 on his person. Both his hip pockets were turned right side outwards. Rhyne carried his money in his left hip pocket. His pocketbook was not on his person after he was shot. . . . I sold whiskey in this station; not such large quantities; do not know how much I would sell on an average each week; I would keep up with it. I could not say how many gallons a week we sold; sold liquor and not beer; kept it in different places under the ground. Had no license; handled liquor and got a profit out of it."

Foyle M. Cox testified, in part: "I lived at Fayetteville, N. C., on 2 May, 1936, this year; operated the Blue Moon Filling Station on the Lumberton road, a mile and a half or two miles from Fayetteville. Rex Swain was my partner. I was indicted in this case with defendant Puckett and entered a plea of guilty in the second degree. I saw Red Puckett on Saturday, 2 May, this year, at the filling station, around noon. Do not know where his home was, but he came to the filling station a week before this; I had known him about a week. He came out by the house and I had not got up. He called me and told me he wanted me to go off with him and I got up and carried my wife and Swain's sister to town to the beauty parlor and told her if I was not there when she got through to meet me at Doc Bennett's; it is a mile or more from the Blue Moon. I went back to Doc's and Puckett came while I was there, with a man called Paul, in a Plymouth sedan. . . . Swain was driving a '36 Ford Coach, black. Puckett said come on and

let's go; one of them stated that. I made no inquiry as to where they were going, but got in the Plymouth with them, headed towards Lumberton. Puckett was driving. We came on down to Jerome Pate's, a mile from the Blue Moon, and met Swain coming from Lumberton. We stopped and talked with him a while about the two automobiles. Puckett asked Swain about driving his car, as he wanted to try it out, and Puckett told Swain he was figuring on trading his car off, and Swain told him he could have the car provided he would let me drive, and Swain took the Plymouth and Puckett the V-8, and Puckett drove to Maxton and Laurinburg and Hamlet and Rockingham; nothing was said as to where we were going. We first stopped at Five Points, in the western edge of Rockingham. We ate barbecue and drank a can of beer apiece at a place on the left-hand side of the road at the forks of the road at Five Points. Puckett did not say there where we were going. We left the place in the car and he said, 'Let's go and get that money'; him and the other fellow were talking; the fellow called Paul. . . . Nothing was then said as to where we would go or what we would do. When we got back to Roy's filling station the car was stopped in the center of the driveway that entered into the cabins on the Rockingham side of the filling station. The only thing that was said was by Paul, 'Stay in the back.' I had been riding in the back seat and Paul in the front. Puckett and Paul got out and I was told to get under the steering wheel and not to leave it, and I did not get out of the car. They both went in the filling station. Roy was lying on the cot there. He went in the back. . . . I could hear some talking but could not hear what was said; heard a fuss and it sounded like chairs turned over and heard someone say, 'Ah, Lee'; that is Lee Morse; heard someone say, 'Stand still,' and then another gun fired and I heard someone else say 'Stand still.' I could not recognize the voices; heard two shots only, fired just a few seconds between the two reports. After the last shot, saw Puckett come from the back of the station from the side towards Rockingham; he came on around the car and said, 'Are you ready to go ?' and someone answered, 'Yes,' and he said, 'Come on.' I saw the other man come out of the station backwards with a gun in his hand. Puckett came out with two and a half pints of Wilson whiskey both in one hand and I saw a gun in his belt. Puckett had on a coat. He did not say anything to me until he had called the other fellow out of the station. Paul got in the car first, in the back. Puckett told me, 'Drive and drive like hell,' and 'I shot him in the arm,' and Paul slapped his hands together and said, 'You are damn right'; said, 'If you ever tell this I will put one through you'; said, 'I killed him.' Paul said that. From Five Points I turned towards Ellerbe to West End, in Moore County, and stopped for gas and to get some water for the radiator. It was a

Standard station.  I poured water in the radiator and busted two cylinder heads.  I stayed at West End a few minutes and headed north, about 50 yards, and pulled to the right towards Carthage; went across to a cross-roads that said '11 miles to Carthage'; and took the right-hand and came out through Pinehurst, Taylortown, a colored section there. Did not stop at Pinehurst; went straight down the highway towards Laurinburg, going through Aberdeen without stopping and saw officers as we passed through standing at the forks of the road, one coming towards Rockingham and the other going towards Pinehurst, and headed from Aberdeen towards Raeford.  The car broke down four miles from Raeford."

The above evidence was corroborated in every respect as to the identity of the defendant and in detail.  The car "was going over the hill towards Raeford, traveling at a high rate of speed, 65 to 70 miles an hour," defendant speeding to avoid detection.

Sultan Penny testified, in part: "I live at Laurinburg, but worked at the Blue Moon Filling Station on 2 May, this year.  It was in control of Rex Swain and Foyle Cox.  I had been knowing Red Puckett about two weeks.  I had been there about two or three weeks and Puckett had come four or five times.  Saw him three times on Saturday, 2 May, the first time before dinner at a crap game at the filling station, in which there were so many I could not count them.  Puckett said he lost what he had.  When he walked out of the station he said, 'I got to go uptown and see my trigger-man; when I come back I will have some money.'  Right after he left, I went out to the house and had some dinner.  Red came back between 2:00 and 2:30, asked me where Jim Cox was at.  Jim Cox was at the house then and I went there and told him Red Puckett wanted to see him. . . . I next saw him between 8:00 and 8:30 that night at the Blue Moon.  Some fellow was with him, whom Puckett called Paul.  Puckett first come out and asked me was there any whiskey there and I told him yes, and he said bring me a drink, and I got a 16-ounce pint of whiskey and carried it out and Red took the first drink and left about an inch in the bottle, a big pint is what you call it, and he handed it to this fellow Paul and he drank the rest. . . . He (Puckett) come in the station and started counting out his money and said, 'Well, I got plenty of damn money to gamble with.'  I counted $720.00.  There were 40 one-dollar bills, a bunch of fives and tens, and five or six twenty-dollar bills, which he had in three different pockets.  The large bills in one pocket, the fives and tens in a side pocket, and the one-dollar bills in his coat pocket. . . . Puckett stayed out there at the house, back of the station where they were gambling, around an hour and a half.  That house is run in connection with the Blue Moon.  There were so many out there I could

not tell who all were. Before he went, I asked him did they have anything they wanted me to lock up or to look after, and some of them gave me pocket knives and Puckett gave me two pistols, one a long barrel gun 32-20 and one a short barrel gun 32-20, one about four and a half inches and one about six or eight inches. I took these pistols to the house and locked them up, and while they were locked up this Swain boy came out there. I got one pistol Puckett gave me and gave to Swain, the short barrel one. The next time I saw it, Mr. Patrick had it in the sheriff's office. Puckett left in an automobile by himself, going towards Fayetteville. His car was there."

Mrs. Roy Rhyne testified, in part: "Q. Do you know whether or not your husband had on his person any sum of money that day or day before? Ans.: No, sir, not that day. He did have about $750.00 on Friday, the night before. I do not know about any money he had that day. He had $750.00 the night before, in a pocketbook fold around." Exception by defendant.

A pistol which had been in the possession of Roy Rhyne, the deceased, was found in the Blue Moon Filling Station. It was left there by Puckett after the homicide. The defendant introduced no evidence, but rested after the State introduced its evidence. The defendant made numerous exceptions and assignments of error, the material ones will be considered in the opinion.

*Attorney-General Seawell and Assistant Attorney-General McMullan for the State.*

*W. Louis Ellis, Jr., and Dye & Clark for defendant.*

CLARKSON, J. *First contention of defendant:* After the verdict the defendant made a motion in the court below "that the judgment be arrested for the reason that the bill of indictment upon which the defendant was tried, is indefinite and uncertain, in the alternative, containing two theories upon which the State was to move, thereby depriving the defendant of his right to know upon which theory the State was moving and to prepare his defense accordingly, the motion in arrest of judgment being made because the bill charges the defendant killed Roy Rhyne 'with premeditation and deliberation, and with malice aforethought, *or* while engaged in the perpetration or in the attempt to perpetrate a robbery.'" The motion was denied by the court below, and in this we can see no error.

N. C. Code, 1935 (Michie), sec. 4200, is as follows: "A murder which shall be perpetrated by means of poison, lying in wait, imprisonment, starving, torture, *or by any other kind of willful, deliberate, and pre-*

*meditated killing, or which shall be committed in the perpetration or attempt to perpetrate any* arson, rape, *robbery,* burglary, or other felony, shall be deemed to be murder in the first degree and shall be punished with death. All other kinds of murder shall be deemed murder in the second degree, and shall be punished with imprisonment for not less than two nor more than thirty years in the State's Prison." (Italics ours.)

Section 4614 is an abbreviated form for a bill of indictment for murder, and the first part of the present bill of indictment is drawn in the very language of the statute. The second part, commencing with "or" was drawn to cover the other aspect of the crime under sec. 4200, *supra.* Under a conviction on either, it was murder in the first degree. The defendant was given full information of the crime on which he was being tried. There was nothing indefinite or uncertain about the bill of indictment. It was in the alternative, but this was merely two counts in one bill of indictment.

Section 4642 is as follows: "Nothing contained in the statute law dividing murder into degrees shall be construed to require any alteration or modification of the existing form of indictment for murder, but the jury before whom the offender is tried shall determine in their verdict whether the crime is murder in the first or second degree." The defendant, under sec. 4613, could have made a motion for a bill of particulars. Bills of indictment not quashed for informality, sec. 4623; nor after verdict for defects which do not vitiate, C. S., 4625.

In *S. v. Leeper,* 146 N. C., 655 (659), citing authorities, we find: "If, however, failure 'to erect' were one offense, and failure 'to repair' were another, being cognate offenses, the remedy was not to quash, but to require the solicitor to elect at the close of the evidence." The indictment followed the words of the statute creating the crime, and also on the first aspect followed the abbreviated form of bills of indictment for murder.

In *S. v. Wilson,* 121 N. C., 650 (655), it is said: "Besides, duplicity is ground only for a motion to quash. Being cured by the verdict, it cannot be used as ground for a motion in arrest of judgment. Whar. Cr. P. L. and Pr., secs. 255, 760." 16 C. J., p. 1258, sec. 2791.

On both aspects in the bill of indictment, the court below charged the law applicable to the facts.

*Second contention of defendant:* Lee Morse testified that the day before the homicide, Roy Rhyne, the deceased, had some $800.00 or $900.00, and described the kind of money it was. Mrs. Rhyne testified that the night before the homicide, defendant had $750.00 "in a pocketbook fold around." The defendant excepted and assigned error, which we cannot sustain.

The charge on which defendant was tried was twofold: (1) The killing with premeditation and deliberation; (2) in the perpetration or attempt to perpetrate robbery. From the evidence in the record there was no doubt that defendant killed Roy Rhyne, and the jury so found. As to his identity there could be no question. Sultan Penny, who worked at the Blue Moon Filling Station, testified that after the homicide, later in the evening, "He (Puckett) come in the station and started counting out his money, and said, 'Well, I got plenty of damn money to gamble with.' I counted $720.00. There were 40 one-dollar bills, a bunch of fives and tens, and five or six twenty-dollar bills, which he had in three different pockets. The large bills in one pocket, the fives and tens in a side pocket, and the one-dollar bills in his coat pocket." The evidence beyond question was competent—the weight and credibility was for the jury to determine.

In *S. v. Atwood*, 176 N. C., 704 (705-6), it is said: "The first three assignments of error are to the admission of testimony that about a week before the homicide the deceased had $65.00 or $70.00 on his person; that on the afternoon of the homicide he was seen with a roll of greenbacks, and that he was paid $3.50 that afternoon. The sheriff testified that only $2.00 or $3.00 was taken out of the deceased's pockets at the undertaker's. There was evidence that, the evening before, the prisoner had $180.00 on his person, and that when arrested he had $246.00. This evidence was competent upon the State's theory, upon the indictment for murder in the first degree, that robbery was the motive of the homicide."

There are several exceptions and assignments of error as to the charge, none of which can be sustained, taking the charge as a whole. The court below, in a careful charge, applied the law applicable to the facts. The court defined the words "deliberation" and "premeditation"; defined murder in the first degree, murder in the second degree, and manslaughter.

*Third:* The court below charged: "It would be your duty to convict Puckett of first degree murder even if one of the others actually fired the shot that killed, if it was done after they agreed and conspired to commit the offense of robbery and while attempting to rob and in the perpetration of robbery death ensued to the deceased, Roy Rhyne, while carrying out and putting into execution their unlawful agreement, whether Puckett did the killing or whether the man Paul did the killing, or the man referred to as Swain did the killing, makes no difference, it would be murder, gentlemen, in the first degree. And if the State has satisfied you beyond a reasonable doubt of these facts, it would be your duty to return a verdict of guilty of murder in the first degree." Prior to the above portions of the charge, the court used the words "at the time they went to the filling station of Rhyne that they had a con-

spiracy between themselves of doing an unlawful act of robbery," etc. "The court charges you, gentlemen, that if Mr. Puckett had conspired and agreed with Mr. Cox, or with the man Paul referred to as 'Paul,' or the man Swain referred to by Morse as 'Swain,' and they went to the filling station to carry out the unlawful purpose of robbery, and to perpetrate robbery, and while in the attempt to perpetrate robbery, he put into execution the unlawful conspiracy and agreement, that the man referred to as 'Paul' or the man referred to as 'Swain,' or any of the coconspirators who may have been with him, if while in the act of perpetrating a robbery or in the attempt to perpetrate a robbery," etc. The defendant excepted and assigned error and contends that the court below should have defined "conspiracy," "coconspirators," etc. The words were used synonymous with "agreed" and "agreement." This was simple language and the meaning readily understood. A similar charge was held free from error in *S. v. Donnell,* 202 N. C., 782 (784).

In *Moss v. Brown,* 199 N. C., 189 (192), we find: " 'In *Bank v. Rochamora,* 193 N. C., at p. 8, quoting numerous authorities, the law is thus stated: "Where the instruction is proper so far as it goes, a party desiring a more specific instruction must request it." This applies to subordinate elaboration, but not substantive material and essential features of the charge. C. S., 564.' *McCall v. Lumber Co.,* 196 N. C., at p. 602."

In the present case, if defendant desired fuller or more elaborate definitions, he should have asked for them by proper prayers for instruction, and not waited until the verdict went against him. *S. v. Graham,* 194 N. C., 459 (467); *Sherrill v. Hood, Comr. of Banks,* 208 N. C., 472 (477).

The law is so plain as to the other matters in defendant's brief, and in fact as to all the matters complained of, that we do not think it necessary to consider same further. The defendant did not introduce any evidence; all the evidence of the State showed a horrible murder with premeditation and deliberation, and also to rob. In the record we find

No error.