The defendant was tried on an indictment for murder. C. S., 4614. He was convicted of murder in the first degree and the following sentence pronounced: "And it is adjudged that the said warden then and there cause a sufficient quantity of lethal gas to be administered to you to cause your death; and may God have mercy on your soul." *Page 52 
The evidence was to the effect that the defendant lived with his parents in High Point. That while held in jail in Lexington with William M. Wilson — both on separate charges of robbery with firearms — he and "Bill" Wilson, with the aid of Lula Belle Kimel, daughter of the jailer, escaped on 3 October, 1938, about 3:55 p.m. Defendant took a .45 Colt revolver from the jailer's desk and Wilson got some .45 automatic cartridges. Defendant handed the Colt revolver to Wilson, who stuck it in his belt. They went down to the Union Bus Terminal and Wilson gave defendant the .45 Colt revolver. They had Wm. Swink, a taxi driver, take them out on the High Point road towards Thomasville and turned to the left on a dirt road. Defendant told Swink, "All right, stop right here," and put the gun pretty close to the taxi driver's neck. Swink saw the gun and stopped. When he stopped Wilson got out, took the taxi driver's seat, cap and badge and drove towards High Point. The taxi driver sat behind Wilson with defendant on the right-hand side back seat. In going over to High Point the taxi driver said, "You want to see my kid's picture?" and reached in his pocket and pulled out his pocketbook. Wilson took his pocketbook and driver's license. They went to defendant's home and Wilson asked Mrs. Godwin where her son Warren was. They got some adhesive tape at a drugstore and drove back to a spot on the highway — defendant was holding the .45 Colt on Swink, who was on the right-hand side of the taxi. Defendant held the gun on him and put his back to a little oak tree, his hands behind him and put adhesive tape on him. Wilson took his wrist watch and stuck a handkerchief across his mouth and wrapped a roll of adhesive tape all around his head. They got in the taxi and went back to High Point and to defendant's home, both went in. Defendant got some clothes and a pair of shoes. In the back of the house defendant opened a drawer and took a .38 pistol out and handed it to Wilson and said, "She is a beauty," and he got some cartridges and started out the door. Defendant said, "Give me that .38." Wilson handed it to him and he loaded it. They got in the front seat of the taxi and drove about looking for a car, "Any way we could get it." They followed a red sedan. Defendant said, "This is a pretty nice car, I would like to have it." Defendant got out of the taxi, which was about out of gas. He talked to the man in the red sedan, the man unlocked the door to the back seat and defendant got in and they drove off. While Wilson was having gas put in the car defendant came running back, he had both guns, he jumped in the car with one gun in his hand and said, "Take off and take off in a hurry, I think I have killed a man." Wilson drove off. "We were aiming to get another car and dump that." Wilson sold the watch taken from the taxi driver to buy gas. After driving around and getting two gallons of gas, they drove out of High Point. They drove to Granite Falls in *Page 53 
Caldwell County, where they were captured. They saw an account of the killing in the Greensboro Daily News and defendant told Wilson: "By God, they will never take me alive." He said, "If they find me now with this pistol, I will burn as sure as hell." After going several different places, they went down in an old barn and slept there in the day. They kept the guns in their hands. They stayed there the next day and night and Wilson gave himself up. He had hid the .45 Colt revolver and informed the officers as to where it was. When defendant came out of the barn he had a pistol in his hand and was commanded to "Halt," but did not and was shot with No. 9 bird shot. He attempted to shoot the officer. When shot he threw the .38 Colt revolver against the barn.
Donald Moss, the deceased, was sitting in his Chevrolet car near the hosiery mill, parked 60 feet from the intersection of Pine Street, headed towards the mill. He and his wife were working in the mill, they worked until twelve o'clock at night. He was off that evening about 7:30 for supper.
The following witnesses for the State testified, in part: W. P. Frazier: "I passed Don's car. He was sitting in it. I threw my hand up and said, `Let's go to work.' He said, `I will be on in a minute.' I had gone approximately thirty feet toward the mill entrance on Pine Street and I heard someone say, `Don't shoot.' I was smoking a cigarette and stopped to finish it and leaned up against the fence with my back and when I heard the first one, then he said, `Don't shoot' again `Please' and then a shot. Q. How many times did he repeat the language, `Don't shoot'? Ans.: I heard it distinctly twice. Q. And you say the last time he said what? Ans.: After the last shot he said `Don't shoot,' he said, `Please' — then I heard a shot. Q. Then what? Ans.: . . . Q. Who was in the car from which the sound was coming? Ans.: I knew Don was up there. Q. Did you recognize the voice? Ans.: No, I did not recognize the voice. I heard a scream and ran back up there and found it to be Donald Moss. . . . Q. State what he was doing and saying just at the time when you got there? Ans.: He was pulling off his coat and he said: `He shot me, what did he do it for?' and by that time two boys ran up and a bunch ran up and Bruce Jones and Bill Hughes picked him up." This testimony was corroborated by Jones.
When Moss was asked for his automobile keys he replied, "They are in my pocket." Moss handed his coat to Frazier, who got the keys out of his right-hand coat pocket. Moss was taken to a hospital, and died the next morning at 7:40 from the wound. The bullet hole was just below the nipple — right chest — went downward. Moss was in perfect health, weighed about 165 pounds, was 5 feet, 5 1/2 inches high. He was *Page 54 
30 years old and a knitter at Adams-Millis Company. He was married in the spring (5 April, 1938) before he was killed on 3 October, 1938. The evening he was killed he was dressed in overalls with a coat on.
Dr. E. A. Sumner: "I attended Donald Moss on the night of October 3rd. . . . I made an X-ray (handing to solicitor). There are two, one of the chest and the other of the abdomen and pelvis. It shows the location of the bullet which is lying on the left side with its nose up about two inches away from the spinal column just behind the pelvic bone. . . . My opinion of the cause of his death is gunshot wound in the abdomen. Only one wound in him. It started on the right and ranged across the right lodging in the left hip. He said, `Doctor, I am suffering so bad I cannot stand it. Do anything you can for me, but I think I am going to die anyway.' He did not talk to me about what happened. I told him we would operate and probably he would be all right."
R. L. Whitaker: "I first saw him (defendant) around 7:45. I was driving a Pontiac eight, and my wife was with me. The automobile was a maroon sedan, and a 1938 model. I first saw James Godwin at the intersection of Lindsay and English Streets as I was entering English Street intersection with Lindsay going south. I drove up to English Street and the red light caught me at the intersection over the center of the road. The light changed as I drove up. I stopped. Godwin came up to the side of my car on my side. He came from the rear of my car and he said to me, `Minister, are you going towards town?' I said, `No, sir, I am going in the other direction.' He said, `I have a car here and I am out of gas.' He said, `I am out of gas and don't know that man over there.' My brother operates that filling station. He said, `I want you to take me to Red's Filling Station to get some gas.' I said to him, `I am in a hurry, how much gas will you have to have? I will get him to let you have a gallon or so.' He then said, `Mister, I appreciate that but I would appreciate it much better if you will run me to Red's Filling Station so that I can get the gas that I want, . . .' Then I said to him, `Where is that filling station?' and he said, `Right over on the corner of English and North Main Street.' I said, `If that is all the way, get in.' And as I pulled off of Lindsay Street into English I felt something in my shoulder pressing pretty tight. Q. Go ahead. Ans.: And I glanced my eye in the mirror and I seen a gun. Ans.: . . . And he said, `You make a left turn.' We had not gone more than fifty feet from English Street then. My wife was in the front seat beside me. He was in the rear. I had my car in second. I pushed down on my accelerator with all power and just before I entered Pine Street he said, `Make that turn.' I was going so fast I could not. I pulled up in high and stepped down on it again with all *Page 55 
power. The gun was hurting. I felt it pressing very tight. Mr. Godwin was standing over me as I could see in the mirror, pressing tight. He said, `Damn you, make that turn,' and his hand was almost on the steering wheel and I snapped right into the filling station on the corner of Em and English. When I made a quick dash to the right, Mr. Godwin was thrown. I ran right in, stepped on my brake and the car stopped quick. I heard something hit. He said, `Oh, hell.' He got out of the door and went running across English Street. He went back toward the hosiery mill, the Adams-Millis mill. I did not see him any more. I was 350 or 400 feet from the Adams-Millis mill when I ran into that filling station and stopped. About a half block. That was right close to 7:45. By gun, I mean a .38 with a six-inch barrel. It looks very much like the gun there (indicating). I heard two shots fired shortly thereafter within three minutes of the time I ran in the filling station. Q. Where did the report that you heard, the report of the shots, appear to be? Q. You say you heard two shots fired? Ans.: Yes, sir. Q. Where were they? Ans.: From over toward the mill. Q. What mill? Ans.: Adams-Millis Corporation."
Bailey Whitaker: "I live in High Point. I run a service station, on the corner of English and Main Streets. On the night Mr. Moss was shot I was on duty. I saw my brother, Mr. R. L. Whitaker, who testified here a while ago, that night. It was around between a quarter to 8:00 and 8:00 o'clock. I heard some shots fired before I saw my brother. I could not say it was he — James Godwin — at my filling station that night. I could not recognize him. The shots were fired near Adams-Millis mill. There was some little difference in them. I saw a taxicab come in my station just in a moment or so afterwards and the man said `Oh, man, run me in some gas and make it snappy, for I am in a hurry.' It was a dark-colored cab with white lettering. Not but one was in it at that time. Just in a moment's time after he called for the gasoline, before I taken off the cap, and I reached back to get my house, I heard someone coming running down the sidewalk, sounded like in a hurry. As I turned back to my tank to trip the lever, he ran by me and fell up beside the driver. Some man, I will not say who. He had on a hat, and he said `Get to God damn hell out from here and let's make our getaway.' I did not see anything in his hand. Absolutely not. The cab pulled out and barred right. It was not over half a minute from the time I heard that shot until the person ran up."
J. W. McMahon: "I received the Colt No. .38 revolver from Mr. Williams and retained it in my custody since that time. I have studied the science of ballistics or firearms since 1918. I have the scientific equipment in the police department of High Point with which to make comparisons of missiles shot from different types of firearms. We use *Page 56 
a comparison microscope. There is the instrument sitting there on the reporter's table. I studied in the Intelligence Division of the United States Army during the World War. Later I got various textbooks and experimented with every type of firearms cases and also of bullets of lead and steel jackets that had been passed and forced through barrels and fired through barrels of various types of weapons. I have seen instruments in the Bureau of Investigation at Washington and attended Northwestern University, for the course of criminology. (State offers witness as an expert, and the court finds as a fact that witness McMahon is an expert in the science of ballistics.) This instrument is a scientific instrument used in making comparisons of missiles fired from different types of firearms. Subsequent to the delivery to me of the Colt .38 revolver which has been offered in evidence, Mr. Williams fired two shots in my presence from the Colt .38 revolver. They were marked in my presence. This is one of the cartridges or missiles fired. I studied the markings on the missile. Q. Are you prepared to state whether you have an opinion as to whether or not the missile which you hold in your hand was fired — Q. Mr. McMahon, state if you have an opinion whether the bullet taken from the body of Donald Moss, was fired from the same identical gun or pistol that the missile that you now hold in your hand was fired from? Ans.: I have. Q. What is that opinion? Ans.: That it was."
After hearing certain evidence on the voir dire, the record discloses: "The Court: After hearing the evidence offered by the State, the court finds as a fact that the statement now about to be asked by the State of the witness Nance was not made upon any threat or inducement or promise or hope of reward."
Ray Nance: "Q. `What statement, if any, did he make there at that time?' is question read by stenographer. Some one of the officers asked him why he did not go ahead and tell the truth about the whole matter. He said, `If I was to tell the truth about the whole matter,' he said, `I would burn and that boy over there . . .' Q. Who was he referring to? Ans.: `Probably get thirty years.' Q. Who was the boy over there? Ans.: I did not see who he pointed to. I was back of the row of cabinets from them. Q. Was Bill Wilson in there? Ans.: I don't know, I wouldn't say positive. Q. Did he make any further statement there at that time following that? Ans.: Someone asked him this question, `James, why did you shoot that man, that is the brutalist thing I ever heard tell of, just to shoot a man when he didn't have anything to say to you or anything?' He said, `Nobody knows, except the man that is dead and me, what was said.'"
H. G. Therrall: "I was at police headquarters at High Point the night they brought Godwin in there. I was there from 7:30 until 8:30. *Page 57 
I heard the defendant make a statement. Q. What was that statement? Ans.: He said, `If I open up and tell the truth I will burn' and pointed to Wilson and said, `He will get 25 or 30 years.' The Court: The court finds as a fact that the statement now asked by the State of the witness was not made upon any threat or inducement or promise or hope of reward, and that it was made voluntarily."
Ernest J. Eubanks, who lived near Granite Falls and knew Bill Wilson: "Q. When you showed James Godwin and Wilson the newspaper, you said you had one, and you said you showed it to them? Ans.: Yes, sir. Q. What did James Godwin do and say about it? Ans.: Godwin told Wilson `I guess they are straight in behind us.' Q. Who said that? Ans.: Godwin told Wilson, `I guess they are straight in behind us,' and he said, `What are we going to do about it?' Q. State, Mr. Eubanks, whether there was an article in the paper about the killing of Mr. Moss. Ans.: Yes sir. Q. State, Mr. Eubanks, if there was a picture of James Godwin in the paper. Ans.: Yes sir. Q. Then what happened after that? Ans.: I said to Wilson, I did not know Godwin — Me and Godwin were talking. Q. Now, what did you say in reply? Ans.: I asked Godwin if that was his picture, and he said `Yes, that is mine.' I said, `Did you shoot a man?' Q. What did he say? Ans.: He said `No, I shot at a man.' He said `I did not know I shot him.' Q. He said, `I shot at one but did not know I shot him?' Q. What else happened? Ans.: I said to Godwin and Wilson both, `Boys, this will get you in trouble.' Ans.: (continuing) I said `Godwin, I am going in and report this,' and they said, `Go ahead, we are going to leave anyway,' and that is all that was said. That is all they said to me."
Miss Ruby Fowler: "Godwin said nothing about any shooting before the paper was brought. Q. Afterwards? Ans.: After he brought the paper and they were reading, they saw that the man had been injured pretty bad. I don't think at the time they knew — Q. Just tell what James Godwin said after he read the paper. Ans.: Well, he said he shot off-hand at the man. He said he ran across to the other car and was scared Bill Wilson was not going to be there, and that is all I know. Q. He said he shot off-hand at a man? Ans.: Yes, sir."
Swink's taxicab was found in a garage at Granite Falls, left there by defendant and Wilson.
The court below excluded the evidence of J. W. McMahon, an officer who was a friend of defendant, and who questioned defendant at some length urging him to tell the truth with veiled promises. There was other evidence of the police officer which the court below thought rendered the confession made incompetent. This statement was excluded by the court below because of the pressure which was exerted by the police officer, McMahon, on defendant. *Page 58 
The defendant introduced no evidence and did not go on the stand as a witness. The jury returned a verdict of "Guilty of murder in the first degree." The court below pronounced judgment of death on defendant. Defendant made numerous exceptions and assignments of error and appealed to the Supreme Court. The material ones and necessary facts will be set forth in the opinion.
The first question presented on the appeal: Was it error for the court below to refuse the defendant's request for a continuance? We think not under the facts and circumstances of this case.
The trial was held on the 11th day after the arrest of defendant and the 15th day following the homicide. The defendant was without counsel and the court below appointed to represent him (a fact of common knowledge) two of the most able, well known and efficient attorneys in Guilford County — where the crime was committed. These attorneys, in well prepared affidavits, set forth in substance that on account of their previous court engagements it would be impossible for them to give such time and attention to preparing the case as they felt was required. That many witnesses for defendant will have to be examined showing "mental and physical condition of the defendant." That the case presents "numerous intricate questions of law requiring a great amount of legal research." That the defendant would rely for his defense, among other things, on the fact that at the time the alleged crime is alleged to have been committed "that he was insane." That the counsel had "been unable to secure all the psychiatrists they desire to examine the prisoner for the purpose of testifying as to his insanity." They tried to get Dr. Beverly R. Tucker, of Richmond, Va., a leading psychiatrist of the country. A telegram, dated 14 October, 1938, from Dr. Tucker said that he could not be present and stated: "These cases require much time and study suggest you get Dr. R. S. Crispbell Duke University or Dr. Ashby Dix Hill." The trial did not commence until 19 October. It was further shown that the parents of defendant, who had lived in Guilford County for some years, were Texans; that many of defendant's near relatives live there. That his uncle and aunt, who live in Houston, Texas, desired to be present at the trial and employ counsel and provide funds necessary for the defense. The uncle of defendant arrived from Houston by airplane the morning of the trial and employed Hon. T. J. Gold (a fact of common knowledge), not only a learned attorney but a State Senator of Guilford County, of great influence in the county. *Page 59 
N.C. Const., Art. I, sec. 35, says: "All courts shall be open; and every person for an injury done him in his lands, goods, person, or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial, or delay."
This provision seems to indicate that when an injury is done to a person affecting his personal or property rights, the due course of law is applicable, and "right and justice administered without sale, denial or delay." To determine this fundamental right, power must be lodged somewhere. This Court has wisely left the matter in the sound discretion of the court below, unless there is "palpable abuse," or "gross abuse," of this discretion.
This Court, in a most thorough opinion, citing a wealth of authorities, said in S. v. Sauls, 190 N.C. 810 (813): "It was subsequently held in a number of decisions that the refusal to continue a case rests in the judge's discretion upon matters of fact which this Court has no power to review. . . . In other cases it is held that while the exercise of discretion must be judicial and not arbitrary it is not subject to review unless `the circumstances prove beyond doubt hardship and injustice,' . . . `palpable abuse' . . . or `gross abuse' . . ." S. v. Rhodes, 202 N.C. 101
(102-3); S. v. Lea, 203 N.C. 13 (24); S. v. Garner, 203 N.C. 361; S. v.Banks, 204 N.C. 233 (237); S. v. Whitfield, 206 N.C. 696 (698).
The second question presented on this appeal: Was it error for the court below to refuse defendant's motion for change of venue or for a special venire? We think not under the facts and circumstances of this case.
N.C. Code, 1935 (Michie), sec. 471, is as follows: "In all civil and criminal actions in the Superior and criminal courts, when it is suggested on oath or affirmation, on behalf of the State or the traverser of the bill of indictment, or the plaintiff or defendant, that there are probable grounds to believe that a fair and impartial trial cannot be obtained in the county in which the action is pending, the judge may order a copy of the record of the action removed to some adjacent county for trial, if he is of the opinion that a fair trial cannot be had in said county, after hearing all the testimony offered on either side by affidavits," etc. It will be noted that the statute limits the right of the court below to remove "if he is of the opinion that a fair trial cannot be had in said county."
Section 472, in part: "The judge shall order the removal of the action, if he is satisfied after thorough examination of the evidence as aforesaid that the ends of justice demand it."
Section 473 provides that additional jurors from other counties may be had instead of removal. *Page 60 
The affidavit of the mother of defendant, Harriet Godwin, for removal, in part, was to the effect: "That the alleged details of the alleged homicide have been the subject of almost universal comment in Guilford County — being the topic of conversation in almost any gathering of people; that the accounts of the alleged homicide have been given a prominent place in said newspapers and have been carried under glaring and sensational headlines, and the said accounts have been published with pictures of the crowd, which assembled at the municipal building in the city of High Point, when the defendant was brought there; that these daily newspaper accounts with their glaring headlines, sensational pictures and morbid details of the alleged homicide, have inflamed that public mind in Guilford County against the prisoner." Attached to the affidavits are the newspaper accounts.
James W. Godwin, father of defendant, in his affidavit corroborates the statements of his wife and says, in part: "That the alleged killing has been given wide publicity with sensational details and pictures in both Guilford and Davidson counties. That this affiant verily believes that the ends of justice require that this cause be tried in some county other than Guilford or Davidson counties, or that a special venire be drawn from some county outside the Twelfth Judicial District for the purpose of selecting a jury to try the defendant."
These motions for change of venue or for special venire were denied by the court below. We think this was in the sound discretion of the court below and no "palpable or gross abuse" of discretion is shown.
In S. v. Hildreth, 31 N.C. 429 (1849), Ruffin, C. J., said: "It is province of the court in which the trial takes place to judge of the truth or sufficiency of the causes assigned for a motion for a continuance or removal of a trial. It must be so; else it would be in the power of a prisoner to postpone a conviction indefinitely, however clear his guilt, by making affidavits with the requisite matter on the face of them. . . . The presiding judge must dispose of such applications in his discretion; and, as in other cases of discretion, his decisions cannot be reviewed here, but are final."
In S. v. Smarr, 121 N.C. 669 (671) (1897), speaking to the subject, the Court said: "It has always been held that the granting or refusing to grant an order of removal is a discretion which the lawmaking power has vested in the trial judge and that his action is not reviewable (citing authorities). These were the uniform decisions even under the former statute. . . . Since then the present statutes have made the discretion reposed in the trial judge still more explicit by forbidding him to remove `unless he shall be satisfied' . . . that the ends of justice demand it."S. v. Turner, 143 N.C. 641; S. v. Wiseman, 178 N.C. 784; *Page 61 S. v. Shipman, 202 N.C. 518 (525); S. v. Lea, 203 N.C. 13
(certiorari denied, 287 U.S. 649).
The third question presented on the appeal: Was the evidence as to the conduct of defendant with Wilson, from their escape from the jail in Lexington until captured, competent? We think so, under the facts and circumstances of this case.
There were numerous exceptions and assignments of error to the evidence of the State's witnesses as to the action of defendant and Wilson from the time they escaped from jail until they were again arrested. None of them can be sustained. The evidence all went to show that until the fatal shot which killed Donald Moss defendant and Wilson each evinced "a heart devoid of social duties and a mind fatally bent on mischief." S. v. Morris,215 N.C. 552. The testimony objected to was to collateral offenses showingscienter, intent, system, design or identity closely connected in point of time with the killing of Donald Moss. Defendant and Wilson, before and after the killing, were together and acted jointly — like Siamese twins.
The question here presented was recently thoroughly discussed in the case of S. v. Smoak, 213 N.C. 79 (91): "In S. v. Miller, 189 N.C. 695
(696), speaking to the subject, it is said: `It is undoubtedly the general rule of law, with some exceptions, that evidence of a distinct substantive offense is inadmissible to prove another and independent crime, the two being wholly disconnected and in no way related to each other. S. v.McCall, 131 N.C. 798; S. v. Graham, 121 N.C. 623; S. v. Frazier,118 N.C. 1257; S. v. Jeffries, 117 N.C. 727; S. v. Shuford, 69 N.C. 486. But to this there is the exception, as well established as the rule itself, that proof of the commission of other like offenses is competent to show the quo animo, intent, design, guilty knowledge, or scienter, when such crimes are so connected with the offense charged as to throw light upon this question. S. v. Simons, 178 N.C. 679, and cases there cited. Proof of other like offenses is also competent to show the identity of the person charged with the crime. S. v. Weaver, 104 N.C. 758. The exceptions to the rule are so fully discussed by Walker, J., in S. v. Stancill, 178 N.C. 683, and in a valuable note to the case of People v. Molineaux,168 N.Y., 264, reported in 62 L.R.A., 193-357, that we deem it unnecessary to repeat what had there been so well said on the subject.'" S. v. Beam,184 N.C. 730; S. v. Flowers, 211 N.C. 721; S. v. Payne, 213 N.C. 719
(724).
The facts, succinctly: Defendant and Wilson were in jail in Lexington, accused on separate charges of robbery with firearms. They escaped with the aid of the jailer's daughter, but before leaving stole from the jailer's desk a .45 Colt revolver and cartridges. They immediately forced a taxicab driver to take them where they wanted to go and took *Page 62 
from the taxi driver his watch, purse, badge, driver's license and cap. Afterwards they tied him to a tree with adhesive tape, stuffed a handkerchief in his mouth and left him there. They then went to defendant's home and got a .38 Colt Revolver and some cartridges and loaded it. Defendant remarked, "She is a beauty." They then drove around looking for a car "any way we could get it." They followed a red sedan and defendant got in the back seat and held his gun to the owner's shoulder, forcing him to drive where he directed; but the owner made a quick dash to the right and ran into a filling station. Defendant was thrown and got out of the door and went towards the hosiery mill. Near the mill Donald Moss sat in his Chevrolet car, about 7:45 p.m., he was shot in the breast and died next morning from the wound. Defendant had the .38 Colt pistol, two shots were fired shortly after he left the filling station going towards the hosiery mill where deceased was shot. Immediately afterwards defendant was seen at another filling station nearby, where Wilson was waiting in the stolen taxicab. Defendant said, "Oh, man, run me in some gas and make it snappy for I am in a hurry." Defendant told Wilson, "Get the God damn hell out of here and let's make our getaway" — "Take off and take off in a hurry, I think I have killed a man." When defendant was captured he had the .38 Colt pistol. The ball that killed Donald Moss was from a .38 Colt pistol and an expert testified that the ball that was taken from the body of Donald Moss was fired from the pistol in defendant's possession when he was arrested.
The fourth question presented on the appeal: Were the confessions made to Ray Nance and H. G. Therral voluntary? We think so, under the facts and circumstances of this case. The court so found, after hearing the evidence on the voir dire. A confession made to J. W. McMahon was excluded as not being voluntary. Defendant contends that the confessions admitted were made after, tainted with the influenced by the confession excluded. The State contends that the confession made to Nance and Therrall were made some time before that made to McMahon. As to these contentions, the court below on the voir dire, after hearing the evidence, held they were voluntary. There was evidence to support this finding.
In S. v. Moore, 210 N.C. 686 (692), we find: "It is true that where a confession has been obtained under circumstances rendering it involuntary, a presumption arises which imputes the same prior influence to any subsequent confession, and this presumption must be overcome before the subsequent confession can be received in evidence. S. v. Drake, 82 N.C. 592;S. v. Lowhorne, 66 N.C. 638; S. v. Roberts, 12 N.C. 259. On the other hand, it is equally well established that although a confession may have been obtained by such means as would exclude it, *Page 63 
a subsequent confession of the same or like facts may and should be admitted, if it appear to the court, from the length of time intervening or from other facts in evidence, the prior influence had been removed at the time of the subsequent confession. . . . (citing authorities). In this jurisdiction, the competency of a confession is a preliminary question for the trial court. S. v. Andrew, 61 N.C. 205, to be determined in the manner pointed out in S. v. Whitener, 191 N.C. 659. The court's ruling thereon will not be disturbed, if supported by any competent evidence," citing authorities. S. v. Fox, 197 N.C. 478; S. v. Blake, 198 N.C. 547.
The confession made to the two witnesses above were practically the same. "He said, `If I open up and tell the truth I will burn' and pointed to Wilson and said `He will get 20 or 30 years.'" We think the matter of admitting the above evidence, under the facts and circumstances of this case, was for the court below, and, upon the findings made by the court on hearing the evidence on the voir dire, we do not think the evidence should be excluded.
The evidence of semi-confessions, not objected to, for example was: Ernest J. Eubanks testified: "I asked Godwin if that was his picture, and he said `Yes, that is mine.' I said, `Did you shoot a man?' Q. What did he say? Ans.: He said: `No, I shot at a man.' He said, `I did not know I shot him.' Q. He said, `I shot a man but did not know I shot him?' Q. What else happened? Ans.: I said to Godwin and Wilson both, `Boys, this will get you in trouble.' Ans.: (continuing) I said, `Godwin, I am going in and report this,' and they said, `Go ahead, we are going to leave anyway,' and that is all that was said. That is all they said to me." Ruby Fowler testified, in part: "After he brought the paper and they were reading, they saw that the man had been injured pretty bad. I don't think at the time they knew — Q. Just tell what James Godwin said after he read the paper. Ans.: Well, he said, he shot off-handed at the man. He said he ran across to the other car and was scared Bill Wilson was not going to be there, and that is all I know. Q. He said he shot off-handed at a man? Ans.: Yes, sir."
It nowhere appears in the record that the defendant introduced any evidence on the voir dire to challenge the State's evidence as to the confessions. There was nothing harmful in refusing to allow repetition of the evidence. Flight may be considered with other facts and circumstances on the question of guilt. S. v. Payne, 213 N.C. 719 (723).
The defendant submitted certain prayers for instruction. Part were substantially given and the others not given. We see no error in this.
The fifth question presented on the appeal: Was there prejudicial or reversible error in the charge? We think not. "It, therefore, becomes your duty, upon a consideration of all the evidence to determine whether *Page 64 
the defendant is guilty or not guilty of the murder whereof he stands charged." The defendant, under the evidence, was either guilty or not guilty of murder. There was no evidence of murder in the second degree or manslaughter arising on the State's evidence. The defendant introduced no evidence. Notwithstanding this, the court below left the question of murder in the second degree to the jury. This was liberal to defendant. We think this contention of defendant untenable and attenuated. All of the evidence tends to show that defendant, being foiled in his attempt to rob the owner of the red sedan, went in the direction of where Donald Moss sat in his parked car and killed him in an attempt to rob him of his automobile. Defendant went running back with both guns and said to Wilson, "Take off and take off in a hurry, I think I have killed a man."
N.C. Code, supra, sec. 4200, is as follows: "A murder which shall be perpetrated by means of poison, lying in wait, imprisonment, starving, torture, or by any other kind of willful, deliberate and premeditated killing, or which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery, burglary or other felony, shall be deemed to be murder in the first degree and shall be punished with death. All other kinds of murder shall be deemed murder in the second degree and shall be punished with imprisonment of not less than two or more than thirty years in the State Prison."
The charge defined the law above set forth applicable to the facts. The court charged fully as to what was reasonable doubt, circumstantial evidence, presumption of innocence, etc., We do not think that the charge impinged C. S., 564. The charge contained some 30 pages. It is full, complete and accurate, giving the contentions fairly for the State and the defendant. The defendant complains that the court below failed to declare and explain the law arising thereon, as the court omitted in its charge to the jury to define robbery, etc. We cannot so hold. S. v. Puckett,211 N.C. 66; S. v. Linney, 212 N.C. 739. The evidence and charge fully set forth the offense with which defendant was charged and if defendant wanted the charge more in detail on the matters complained of, he should have submitted prayers for instructions. If any of the contentions set forth by the court below in the charge were erroneous the court's attention should have been called to it so that the court could have had an opportunity to correct it. S. v. Johnson, 207 N.C. 273.
We do not think S. v. Hart, 186 N.C. 582 (589), cited by defendant, is applicable here. We think the court below gave the defendant a "fair, impartial and lawful trial by a jury of his peers." We see no prejudicial or reversible error in any of the exceptions and assignments of error made by defendant. *Page 65 
After the jury brought in its verdict and the formal motions to set aside and that judgment be arrested had been denied, the defendant through his counsel suggested that he was insane and moved that judgment be suspended pending inquiry into his sanity. In support of this motion was an affidavit by John Dyer, M.D., a physician of Guilford County, stating that in his opinion James Godwin is now insane. This affidavit was signed eight minutes after the jury retired on 21 October. The affidavit further states that the affiant observed James Godwin on 21 October, 1938, and formed an opinion as to his sanity. 21 October was the last day of the trial, the jury retiring at 4:24 p.m. The observations which John Dyer made must have been in the courtroom on that day. James Godwin did not go on the stand and the affiant does not indicate that Dr. Dyer talked to him alone or did anything more than "observe" him. The case of S. v. Vann, 84 N.C. 722
(1881), is not controlling. That case was decided prior to the present statute, C. S., 6237, which became law for the first time as section 65 of chapter 1 of the Public Laws of 1899. The case of S. v. Vann, supra, therefore, states the common law rule. After 1899, the matter was controlled by statute and it is, therefore, important to examine the language of the statute. The common law rule is stated in 16 C. J., page 1283, as follows: "Under the common law, where a suggestion of defendant's insanity is made after conviction and before sentence, it is sufficient ground for the court to postpone sentence until this fact can be ascertained," citing S. v. Vann, supra. "The plea of insanity at this stage of the case is only an appeal to the humanity of the court to postpone punishment until a recovery takes place, or as a merciful dispensation. Thus, where a defendant's insanity is suggested after conviction, it is within the discretion of the court to take such action as it deems best." Speaking of Statutory provisions, the text continues as follows: "They usually authorize suspension of sentence in such case if, in the opinion of the court, there is any reasonable ground for believing defendant to be insane." 16 C. J., 1284.
The pertinent part of C. S., 6237, is, "When a person accused of the crime of murder . . . shall be found by the court to be without sufficient mental capacity . . . to receive sentence after conviction." The statute requires that an inquisition shall be had when a person "shall be found by the court" to be without sufficient mental capacity. A finding by the court implies a discretion of the trial judge and on the evidence presented by the affidavit, it cannot be said that the trial judge abused his discretion.
The only case since the statute which deals with this question is S. v.Khoury, 149 N.C. 454. While the case is not exactly in point, there is a discussion of the problem raised by S. v. Vann, supra. It was *Page 66 
pointed out that, in that case the trial judge directed that a jury be impaneled to try the question of the defendant's sanity and that action of the trial judge was affirmed. The Court, in S. v. Khoury, supra (p. 456), then continued by quoting from a text on insanity, as follows: "Although, if there be a doubt as to the prisoner's insanity at the time of his arraignment, he is not to be put upon trial until the preliminary question is tried by a jury. The question of the existence of such a doubt seems to be exclusively for the determination of the court; and counsel for the defendant can neither waive an inquiry as to the question of defendant's sanity, nor compel the court to enter upon such an inquiry when no ground for doubting it appears. . . . And the question whether an inquiry is called for by the circumstances of the case, is for the determination of the court."
The Supreme Court further suggested that where a defendant is at the bar of the court, when his manner, appearance, etc., may be seen by the judge, the trial may not be stopped by the mere suggestion of counsel that a jury be impaneled to try the defendant's sanity. In this case, the defendant did not go on the stand and no evidence was introduced in the defendant's behalf. The jury's verdict is conclusive of all matters embraced in it, including the defendant's capacity to commit the crime charged. The court below in his discretion, and in view of the jury's verdict, was undoubtedly of the opinion that the suggestion of the defendant's insanity after the jury's verdict came in was not supported by sufficient evidence to raise any doubts. His action in refusing to suspend judgment pending inquiry into defendant's insanity was, therefore, proper, and we see no reversible error.
The entire record shows defendant to be a bad man and dangerous with firearms. The criminal conduct of defendant in so short a time after escaping from the jail at Lexington with Wilson could hardly be equaled. The killing of the unoffending hosiery worker, in an effort to rob him of his car, was ruthless and dastardly. He fled and defied the officers of the law and had to be shot in being arrested. On the trial of defendant in the court below, he did not try to show that he was insane at the time he killed Donald Moss, as found by the jury. The theory of the defense was that he did not kill him. It is truthfully written, "For they have sown the wind and they shall reap the whirlwind." The defendant has had a fair, impartial and lawful trial.
In the judgment of the court below we find
No error. *Page 67